887 So.2d 201 (2004)
Gladys Bowens HOWARD, as administratrix of the estate of Marilyn Faye Bowens, deceased
v.
CITY OF ATMORE et al.
No. 1021312.
Supreme Court of Alabama.
December 12, 2003.
As Modified on Denial of Rehearing February 20, 2004.
*202 Charles R. Godwin and Timothy J. Godwin, Atmore, for appellant.
Lawrence M. Wettermark and Thomas O. Gaillard III of Galloway, Smith, Wettermark & Everest, L.L.P., for appellees.
WOODALL, Justice.
Gladys Bowens Howard, as administratrix of the estate of her sister, Marilyn Faye Bowens, deceased, appeals from a summary judgment entered in favor of the City of Atmore; Joseph Daniel McKinley, the police chief of the City of Atmore; and police officer Frank Bryars in Howard's wrongful-death action arising out of the suicide of Marilyn Faye Bowens, while she was in the custody of the police department of the City of Atmore ("the City"). We affirm in part, reverse in part, and remand.
The following facts are undisputed: On May 24, 1999, following convictions for third-degree theft of property, third-degree assault, resisting arrest, and destroying city property, Bowens began serving a 120-day sentence in the City jail. The jail was equipped with a video camera that allowed continuous monitoring of Bowens's cell from a remote location.
At 3:00 p.m. the next day, May 25, Betty Cox completed her eight-hour shift as the jailer/dispatcher. Before leaving for the day, Cox conducted a cell check of the inmates. At that time, Officer Frank Bryars began his shift as the jailer/dispatcher, replacing Cox. At 4:08 p.m., Sgt. Carey Flavors went to Bowens's cell to speak with her. He found Bowens hanging by the neck from bars in the ceiling, to which she had attached herself with her shoe laces. Flavors "yelled for help," and he and Officer Bryars removed Bowens from the makeshift noose. Bowens died without regaining consciousness. Subsequently, Howard filed this wrongful-death action against the City and against Chief McKinley and Officer Bryars, in their individual and official capacities.
The defendants moved for a summary judgment, contending that they are entitled either to "peace-officer" immunity, pursuant to Ala.Code 1975, § 6-5-338, or to "State-agent" immunity under the analysis set forth in Ex parte Cranman, 792 So.2d 392 (Ala.2000), and adopted in Ex parte Butts, 775 So.2d 173 (Ala.2000). The trial court entered a summary judgment for all the defendants, relying expressly on *203 the ground of immunity. Howard appealed.

I. Immunity
Chief McKinley and Officer Bryars contend that they are entitled to peace-officer immunity, as set forth in § 6-5-338(a). That section provides:
"Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."
(Emphasis added.)
By enacting this statute, the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts. Sheth v. Webster, 145 F.3d 1231, 1237 (11th Cir.1998). Indeed, "[t]his statute, by its terms, extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties." Moore v. Crocker, 852 So.2d 89, 90 (Ala.2002) (emphasis added).
In Ex parte Cranman, supra, this Court "restated the law of state-agent immunity in Alabama." Moore, 852 So.2d at 90. Since Cranman, we analyze immunity issues in terms of "State-agent" immunity, rather than "under the dichotomy of ministerial versus discretionary functions." Ex parte Hudson, 866 So.2d 1115, 1117 (Ala.2003). See also Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003); Ex parte Turner, 840 So.2d 132, 134 n. 1 (Ala.2002). Thus, we will address the applicability of peace-officer immunity under the principles set forth in Cranman. See Moore, supra; Ex parte Duvall, 782 So.2d 244 (Ala.2000).

A. Officer Bryars
Howard's claims against Officer Bryars are based on allegations that Officer Bryars "negligently or wantonly failed to implement reasonable precautionary measures, including, but not limited to, the Atmore Police Department's Standard Operating Procedures, to prevent [Bowens] from committing suicide." Howard's brief in opposition to defendants' motion for summary judgment.
As a threshold matter, Howard contends that Officer Bryars is not entitled to peace-officer immunity, because, she argues, § 6-5-338(a) does not apply to jailers. More specifically, she states: "Because Bryars was not performing any of the duties enumerated in § 6-5-338, but rather was acting as a dispatcher/jailer, he should not be cloaked with § 6-5-338 immunity. His performance of the duties of jailer/dispatcher was outside the `line and scope of his ... law enforcement duties.'" Howard's brief, at 66 (emphasis added). We disagree.
*204 Simply stated, the statute shields every defendant who (1) is a "peace officer," (2) is performing "law enforcement duties," and (3) is exercising judgment or discretion. It is undisputed that Officer Bryars was a sworn law-enforcement officer at the time of Bowens's suicide, and that he was temporarily serving as a jailer/dispatcher while he was recuperating from surgery. The first element is, therefore, satisfied. The second inquiry is whether the guarding of a city jail by a regular police officer is one of the "law enforcement duties" contemplated by the statute.[1] We answer that question in the affirmative.
"All cities and towns of this state ... have the power to establish, erect, maintain and regulate jails, ... and to purchase and provide for any and all things which may be deemed advisable or necessary thereto...." Ala.Code 1975, § 11-47-7. Thus, it requires no stretch of logic to conclude that the operation of jails by municipal police departments is a "law enforcement" function. Indeed, this Court has expressly determined that a "jailer ... is a peace officer," and has adopted the view that the "custodian of a convict" is a "law enforcement officer... engaged in the active discharge of his lawful duty," within the meaning of Act No. 746, § 3, Ala. Acts 1967, formerly codified at Ala.Code 1975, § 13-1-42 (criminalizing assault on a "peace officer or other law enforcement officer ... engaged in the active discharge of his lawful duty") (repealed by Act No. 607, § 9901, Ala. Acts 1977).[2]House v. State, 380 So.2d 940, 941 (Ala.1979). In doing so, this Court explained:
"`"Whether those performing [the duties of a correction officer] bear the title of jail guard, warden or correction officer, overseeing the custody and punishment of law violators is as much a part of law enforcement as undertaking the detection and apprehension of such violators. Moreover, they have the further duty of detecting and preventing violations of law by prisoners, e.g., assaults on other prisoners, escapes, etc., and in that sense are literally law enforcement officers...."
"`... [P]rison guards are "law enforcement officers," particularly since it is their duty to force the convicts to obey and endure the sentence of the law.'"
380 So.2d at 942 (quoting and adopting the reasoning of Presiding Judge Cates in his special concurrence in Lowe v. State, 54 Ala.App. 280, 285, 307 So.2d 86, 90-91 (1974), which was adopted by the court on rehearing) (emphasis added). We hold, therefore, that the guarding of a city jail by a regular municipal police officer is a "law enforcement dut[y]" within the meaning of § 6-5-338(a).
Next, we consider Officer Bryars's conduct in light of the Cranman factors. In Cranman, we said:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or

*205 "(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405 (emphasis in original).
Moreover, "[w]e have established a `burden-shifting' process when a party raises the defense of [S]tate-agent immunity." Giambrone, 874 So.2d at 1052. Under this process, Officer Bryars "bear[s] the burden of demonstrating that [Howard's] claims arise from a function that would entitle [him] to immunity." 874 So.2d at 1052. "If [he makes] such a showing, the burden then shifts to [Howard], who, in order to deny [Officer Bryars] immunity from suit, must establish that [Officer Bryars] acted willfully, maliciously, fraudulently, in bad faith," 874 So.2d at 1052, or that he "was not exercising his ... judgment in the manner set forth in the examples in Cranman." Ex parte Hudson, 866 So.2d at 1118.
Howard first contends that Cranman affords Officer Bryars no immunity, because, she insists, guarding inmates in a municipal jail is not expressly included in the categories of conduct in that opinion. Specifically, she states:
"Cranman is a departure from the days in which a court was required to engage in the discretionary versus ministerial function analysis. The old `discretionary functions' are now embodied in a comprehensive test and where the conduct at issue does not fall within a category of conduct recognized by the restated rule as immune, the official is therefore not entitled to state-agent immunity.
"....
"According to the Cranman test, the conduct that is challenged in this case, i.e., training, implementing/enforcing procedures, and identification and handling of potentially suicidal persons in confinement, [does] not fit within any *206 category of conduct recognized by the restated rule as immune."
Howard's appellate brief, at 39-41 (emphasis added).
Howard's reading of Cranman is too rigid. Cranman is a restatement of the law of immunity, not a statute. Categories (3) and (4) of that restatement are clearly broad enough to contemplate the confinement of prisoners, which is the conduct in controversy here.
On its face, Cranman disclaims the rigidity, or exclusivity, attributed to it by Howard. In other words, Cranman states categories, but does not purport to set forth an exhaustive list of activities falling within each category. Thus, the Cranman categories include the guarding of a city jail by a regular municipal police officer.
Howard next contends that Officer Bryars is not entitled to immunity, because, she insists, he failed to follow mandatory rules and procedures prescribed by the City police department for observing inmates. She refers specifically to an "Administrative Order" ("the order"), which constituted a portion of the "Standard Operating Procedures Manual" ("the manual"). The defendants submitted the order and other pertinent portions of the manual in support of their motion for a summary judgment.[3] Regarding the order and the manual, Chief McKinley's affidavit states, in pertinent part:
"4. The [City] has written policies and procedures directed toward preventing injury to persons confined in the Atmore City Jail, including persons who might attempt suicide. There is also video monitoring equipment in the jail used to assist in monitoring inmates. In addition, there are some unwritten policies used in the Atmore City Jail to minimize the risk of inmate suicide. All of these policies, procedures and equipment were in place at the Atmore City Jail as of May 25, 1999.
"5. The day to day operation and control of the jail is generally performed by an employee serving both as a dispatcher and jailer. Attached to this affidavit and marked as Exhibit A is a copy of the job description of dispatcher from the [manual] of the City of Atmore.
"6. In addition, the shift supervisor, generally a police sergeant, is also charged with consulting with the dispatcher/jailer in instances where an inmate demonstrates a potential for suicide or to harm themselves. Attached to this affidavit and marked as Exhibit B is a true and correct copy of the job description of police sergeant from the [manual] of the City of Atmore, along with the administrative order for the communications unit of the [City], a true and correct copy of which is attached as Exhibit C.
"....
"10. Typically, dispatchers are required to make a cell check twice an hour and more frequently as they see a need. The cell check consists of the dispatcher physically walking into the jail area and viewing the person in their cell."
(Emphasis added.)
The order states in part:
"ADMINISTRATIVE ORDER
"....
"THE FOLLOWING FIELD COMMUNICATIONS PROCEDURE SHALL BE ADHERED TO BY ALL PERSONNEL:

"....
"ADMISSIONS PROCEDURE

*207 "Admission procedures for the municipal jail are as follows:
"....
"7. The dispatcher on duty shall make periodic jail checks on inmates at least twice an hour and more often if needed or circumstances call for additional checks. The monitor camera will constantly be operating and observed by dispatchers. Dispatchers, DO NOT release inmates for any reason except for an emergency evacuation (follow procedure for emergency evacuation plan).
"....
"RESPONSIBILITY OF DISPATCHER/JAILERS
"Dispatcher/Jailers shall be responsible for the following:
"1. Adhering to all guidelines set forth in these procedures.

"2. Enforcing and implementing all guidelines.
"....
"10. Making checks of intoxicated persons, drug addicts, physical and mental health risks and suicidal risks every thirty minutes. These rounds shall be documented on the radio log.
"11. Observe television monitors continuously, listen to the intercom, and check smoke detectors for safety and security purposes."
(Some boldface type and some emphasis omitted; emphasis added.)
Howard relies on paragraph 10, which appears in the portion of the order entitled "RESPONSIBILITY OF DISPATCHER/JAILERS." She argues that paragraph 10 required Officer Bryars to check on Bowens every 30 minutes, because, she insists, there was evidence from which Officer Bryars should have identified Bowens as a suicide risk, and because, she contends, there was evidence that those checks were not made. In response to this argument, the defendants state:
"There are no specific written instructions or statutes setting out how [Officer] Bryars should make a determination about whether an inmate is potentially suicidal.... Therefore, the initial determination of whether an inmate should be placed into the category of a suicide watch is not controlled by any written instructions and the particular officer must use his discretion in the context of that situation to make an appropriate decision."
Appellees' brief, at 44-45 (emphasis added).
We agree with the defendants that Howard's reliance on paragraph 10 is misplaced. Whether an inmate is a "drug addict," a "physical or mental health risk," or a "suicide risk" must be determined on a case-by-case basis, and necessarily requires the exercise of judgment in each case. Thus, Officer Bryars's alleged noncompliance with paragraph 10 does not strip him of his cloak of State-agent immunity.
Howard, however, also relies on paragraph 7, which appears on the same page as paragraph 10, under the heading "ADMISSIONS PROCEDURE." Her reliance on paragraph 7 stands on better ground. Indeed, Bryars fails to address Howard's argument as it relates to paragraph 7.
Paragraph 7 simply states that the jailer/dispatcher "shall make periodic jail checks on inmates at least twice an hour," and requires constant observation of the "monitor camera." Unlike paragraph 10, paragraph 7 does not turn on the subjective observations or assessments of individual inmates, or contemplate the exercise of judgment by individual jailers. Thus, it applies to all inmates, rather than to certain *208 at-risk persons, and does not apply on a case-by-case basis.
In cases decided after Cranman, this Court has held what was clearly implied in Cranman, namely, that a "State agent acts beyond authority and is therefore not immune when he or she `fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala.2000)) (emphasis added). The complaint in Giambrone sought compensation for injuries suffered by 15-year-old Jake Giambrone, a member of the wrestling team, in an impromptu wrestling match with Michael Douglas, the head wrestling coach for Auburn High School. 874 So.2d at 1049. Douglas outweighed Giambrone, who was a freshman, by approximately 70 pounds. Id. The trial court entered a summary judgment in favor of Douglas on the ground of State-agent immunity.
In this Court, the appellant argued that the summary judgment was improper, because there was evidence indicating that "[Douglas] violated the competition guidelines as promulgated by the National Federation of Wrestling (`NFW'); and ... engaged in `inequitable competition' with Jake in violation of the code of conduct contained in the Alabama High School Athletic Directors and Coaches Association Directories (`the Athletic Directories')." 874 So.2d at 1051 (emphasis added). This Court agreed with that argument and reversed the summary judgment. 874 So.2d at 1057.
In doing so, the Court noted that, as a general principle, "Douglas was permitted to exercise broad judgment in the education of his students." 874 So.2d at 1053. It explained, however, that Douglas's supervisor, the athletic director, had "instructed the coaches ... to follow the guidelines in the Athletic Directories," and that he had "provided Douglas with a book containing rules promulgated by the NFW in order to make sure that Douglas knew the rules for conducting wrestling matches." 874 So.2d at 1054. The Court stated:
"Although [the athletic director] was not directed by the [Auburn City Board of Education] to impose on the coaches at Auburn High School the guidelines and rules of the ... NFW and the Athletic Directories, it was within the exercise of his judgment to `insist' that the coaches comply with those guidelines and rules.
"Therefore, Douglas's `broad authority' to exercise judgment in the safe conduct of his wrestling team practices was limited by the guidelines and rules furnished and imposed by [the athletic director]."
874 So.2d at 1054. The Court concluded:
"The guidelines and rules removed Douglas's judgment in determining whether he should participate in a `full speed' challenge match with a student who was less experienced, much younger, and smaller than Douglas. Moreover, the guidelines and rules restricted the type of moves that are permissible in the sport of wrestling. Because a trier of fact could determine that Douglas performed an illegal move during an `inequitable' challenge match, thereby failing to discharge his duties pursuant to `detailed rules or regulations,' we cannot determine at this stage in the proceedings that Douglas is entitled to State-agent immunity. Douglas did not met his burden of establishing that his actions and decisions involved functions that entitled him to immunity."
874 So.2d at 1055 (emphasis added).
Like the "guidelines and rules" in Giambrone, paragraph 7 of the order left no *209 room for the exercise of judgment as to the manner in which or the frequency with which Bowens should be monitored. Moreover, Howard presented substantial evidence indicating that Officer Bryars failed to discharge the duties imposed by paragraph 7.
Bowens's suicide was investigated by Agent Douglas Darby of the Alabama Bureau of Investigation. According to Darby's deposition, Officer Bryars told Agent Darby that Officer Bryars made a "jail check" on all the inmates when he arrived at 3:00 p.m. to begin his shift. Also, Officer Bryars told Darby that he saw Bowens on the "monitor camera" once between 3:00 p.m. and 4:08 p.m., but that he never saw her at any other time, either by jail check, or by monitor, until she was discovered at 4:08 p.m., hanging from the bars. Thus, by his admission, Officer Bryars failed to comply with paragraph 7, which requires the jailer to make "jail checks" of all inmates at least twice per hour, and "constantly" to observe the "monitor camera." Indeed, Officer Bryars testified that when Sgt. Flavors "yelled for help" at 4:08 p.m., Officer Bryars looked at the camera monitor of Bowens's cell and saw her hanging from the ceiling. There is evidence, therefore, from which a jury could find that, had he been observing the monitor in compliance with paragraph 7, he could have seen Bowens tying her shoelaces to the overhead bars and making other preparations to hang herself.
To be sure, Officer Bryars filed an affidavit on June 30, 2000, in which he testified that he "observed Marilyn Bowens on the video monitor approximately five to ten minutes before she was discovered hanging," and noticed nothing "unusual." However, to the extent that the affidavit contradicts his admissions to Agent Darby, it does nothing more than add to the body of evidence to be considered by a jury. Because Officer Bryars is not entitled to State-agent/peace-officer immunity on Howard's claims that he failed to monitor Bowens in the manner prescribed in paragraph 7 of the order, the trial court erred in entering a summary judgment in his favor on the ground of immunity, only insofar as that claim is concerned.[4]

B. Chief McKinley
Howard's claims against Chief McKinley are based on allegations that he "negligently or wantonly failed to implement and/or enforce procedures relating to the identification and handling of potentially suicidal inmates," and, more specifically, that he "negligently or wantonly failed to train [Officer Bryars] in the identification and handling of potentially suicidal inmates." Howard's brief in opposition to defendants' motion for summary judgment. In particular, Howard states that "[d]uring Chief McKinley's tenure, which began in 1996, there [have] been several suicides and suicide attempts by inmates at [the City police department] prior to Bowens's death," Howard's appellate brief, at 46, including an apparent suicide attempt by Bowens during a previous incarceration. She suggests that he failed to adjust his policies in response to those occurrences, and that he failed to avail himself and his police department of certain jail-management training seminars dealing with the foreseeability of inmate suicides.
Simply stated, the claims against Chief McKinley allege faulty training and supervision. It is undisputed that Chief McKinley is responsible for the "day- to-day operations *210 of the [police] department and the city jail." Affidavit of Chief McKinley. Those activities fall squarely within category (2) of the Cranman formula:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"....
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;

"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel...."
Cranman, 792 So.2d at 405 (first emphasis original; subsequent emphases added).
Howard directs us to no statute, rule, or regulation binding on Chief McKinley that purports to direct him in a particular manner as to the "administration of [his] department," or to the training and supervision of its personnel. She merely contends that Chief McKinley's department has failed "to implement modern penalogical practices such as intake screening forms or processes, removal of potentially lethal means of suicide such as shoe strings and belts (even after recommendations by the ABI)," and, in this respect, has "lagged behind evolving standards of detention and incarceration." Howard's appellate brief, at 50. These allegations are based, however, on statistics regarding annual suicide rates from general publications, such as, National Institute of Corrections, U.S. Dep't of Justice, Prison Suicide: An Overview and Guide to Prevention (1995).
Thus, there is a conspicuous absence of binding authority as to how to identify and handle a potential suicide risk and what precautions to take in any particular case. In the final analysis, the responsibility falls upon Chief McKinley to formulate suicide-prevention rules for his department, based on a myriad of factors, including the availability of resources and personnel. Category (2) of the Cranman formula expressly contemplates this scenario.
In this connection, Howard argues that category (2) does not specifically mention "training." She says: "In category (2)(d), this Court identified certain conduct of supervisory personnel such as Chief McKinley as immune. This Court included hiring, firing, transferring, assigning or supervising. It did not include training." Howard's appellate brief, at 41 (emphasis added). Thus, she argues, "the conduct that is challenged in this case, i.e., training, implementing/enforcing procedures, and identification and handling of potentially suicidal persons in confinement, [does] not fit within any category of conduct recognized by [Cranman] as immune." Id. Once again, Howard reads Cranman too rigidly. "[T]he situations listed in subparagraphs (2)(a)-(d) of the Cranman immunity rule are expressly only `examples' of the general principle stated in paragraph (2) itself." Ryan v. Hayes, 831 So.2d 21, 31 (Ala.2002). Category (2)(a)-(d) includes "training," as well as "supervising."
Howard has made no showing  or argument  that Chief McKinley acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority. Thus, Howard has not met her burden to show that Chief McKinley's conduct falls within an exception to State-agent immunity. The trial court did not err, therefore, in entering a summary judgment in his favor. We next address Howard's claims against the City.

*211 C. The City

Howard contends that the City is "vicariously liable for the neglect, carelessness and unskillfulness" of Chief McKinley and Officer Bryars. It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune. Section 6-5-338(b) provides: "This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers." (Emphasis added.) See Ex parte City of Gadsden, 781 So.2d 936, 940 (Ala.2000). On the other hand, if the statute does not shield the officer, it does not shield the city. Borders v. City of Huntsville, 875 So.2d 1168, 1183 (Ala.2003).
In this case, § 6-5-338 shields the City from liability for the alleged "neglect, carelessness and unskillfulness" of Chief McKinley. Thus, the trial court correctly entered a summary judgment for the City with respect to the claims against Chief McKinley. However, the statute does not shield the City from liability for the alleged "neglect, carelessness and unskillfulness" of Officer Bryars, based on evidence indicating that he failed to comply with paragraph 7 of the order. Insofar as the summary judgment for the City was entered with respect to those claims, the trial court erred.

II. Summary
In summary, the judgment in favor of Chief McKinley is affirmed. The judgment in favor of Officer Bryars is reversed, to the extent of the claims alleging wrongful monitoring of Bowens under paragraph 7 of the order, and the case is remanded for further proceedings. To the extent that judgment disposed of claims based on portions of the order or manual contemplating the exercise of judgment, as discussed above, the judgment is affirmed. To the extent the judgment in favor of the City is based on vicarious liability for the acts of Chief McKinley, the judgment is affirmed. To the extent that judgment is based on vicarious liability for the acts of Officer Bryars for which Bryars is not immune, the judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, HARWOOD, and STUART, JJ., concur.
JOHNSTONE, J., concurs specially.
JOHNSTONE, Justice (concurring specially).
I concur fully in the main opinion. I write specially only to add a couple of supportive observations.
The main opinion correctly holds "that a State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." 887 So.2d at 208 (internal quotation marks omitted, emphasis in main opinion). The second exception to immunity as stated by Cranman excepts conduct "beyond [the State agent's] authority." 792 So.2d at 405. A State agent's violating applicable rules or regulations is, of course, "beyond his or her authority," id.
In further support of part "B. [Immunity of] Chief McKinley" in the main opinion, I add that immune category (1) of the Cranman restatement, immunizing a State agent's "formulating plans, policies, or designs," 792 So.2d at 405, immunizes Chief McKinley's failure to adapt the policies of *212 his department as the plaintiff contends he should have adapted them.
NOTES
[1] This case does not present the issue whether the immunity afforded by § 6-5-338(a) applies to a city-jail guard who is not a regular municipal police officer.
[2] Act No. 746, § 3, provided, in part:

"Whenever any peace officer or other law enforcement officer of this state or any political subdivision of this state shall be engaged in the active discharge of his lawful duty or duties, it shall be unlawful for any person to commit any assault with a deadly instrument upon such officer...."
[3] The manual was promulgated by Chief McKinley's predecessor.
[4] Howard also contends that Bryars is liable for failing to remove Bowens's shoelaces. However, this argument suffers the same infirmities inherent in her argument relating to paragraph 10 of the order, because Howard points to no binding rule or regulation negating the exercise of judgment as to when an inmate's shoelaces must be removed.