PARKER, Justice.
 

 Cecilia J. Dixon and the City of Montgomery (“the City”) petition this Court for a writ of mandamus directing the Montgomery Circuit Court to vacate its order denying their immunity-based motion for a summary judgment. We grant their petition and issue the writ.
 

 Background
 

 The plaintiff, Linda Hollingsworth, a correctional officer employed by the City at the Montgomery municipal jail, sued Dixon, a major with the City of Montgomery Police Department and the Administration Division Commander, in her individual capacity and in her official capacity as a correctional officer with the Montgomery Police Department; the City of Montgomery Police Department; and three fictitiously named defendants. The cause of action arose when Dixon conducted a body search of Hollingsworth because Hollingsworth was the last person known to have been in possession of an inmate’s money, which was subsequently reported to be missing. As Administration Division Commander, Dixon was responsible for the operation of the Montgomery municipal jail. The complaint alleged four counts: assault and battery, invasion of privacy, negligent hiring, training, and/or supervision (against the City of Montgomery Police Department), and false imprisonment. The City responded to the complaint on behalf of the Montgomery Police Department, explaining the substitution in the barest terms in a footnote in its motion for a summary judgment, saying: “Because the Montgomery Police Department is not a legal entity to be sued, this Motion for Summary Judgment is submitted by City of Montgomery.”
 
 [1]
 

 The incident underlying this action occurred on May 15, 2007, when Dixon was advised by one of the supervisors at the jail that an inmate’s money was missing. The warden of the jail was not available, so Dixon went to the jail to resolve the matter. She was told that the newly installed video equipment, which should have recorded all the pertinent activity, was not working. Dixon obtained the assistance of
 
 *1173
 
 officers who could get the video equipment working, and she proceeded to assess the situation. These events are summarized in Dixon’s deposition:
 

 “We had new videos installed in the jail when I was the admin, commander. We were in the process — they hadn’t been in the jail very long. And it was for the jailers’ own protection and everything. So we had video installed in the jail. Some of it was so that when jailers were checking people in, the cameras went right down onto the desk where money and everything was. There were cameras put all over the jail. It was new equipment, so a lot of the jailers weren’t familiar with the way to handle the equipment.
 

 “They said that the video cameras weren’t working.... Anyway, there were three or four other police officers that came to the jail to help me see if we could get the cameras up and running.
 

 “They had been dealing with this an hour, an hour and a half — maybe. The person who the money belonged to was kind of over here in our holding cell, so he saw us kind of running around like chickens with our head cut off, you know. Then the attorney was over here. He saw what we were trying to do, that the money was gone and, you know, we didn’t really know where it was. I mean, it had been such a long time, and I thought, we’ve got to get it settled.
 

 “So Ms. Hollingsworth was the last person seen with the money, and so I took it upon myself — and I called Marie Jenkins and I asked her if she would escort me to go into the office with Ms. Hollingsworth, because I was fixing to start searching everybody. But since she was the last person with the money, I started with her. Now, my intention was I was going to get everybody. But when we came back in, they were getting the video — after I had searched Ms. Hollingsworth, they were getting the video up and running.
 

 “Well, while I was in the office with Ms. Jenkins and Ms. Hollingsworth about searching her, I apologized to her and told her — we have a policy that anybody can be searched, you know, in the jail and it includes employees.”
 
 [2]
 

 Dixon later testified in the same deposition regarding the actual search of Holl-ingsworth:
 

 “Q. And did you order Ms. Hollings-worth for a strip search?
 

 “A. Yes, sir.
 

 “Q. Okay.
 

 “A. Let me clarify that. Can I clarify that?
 

 “Q. Sure. Yes, ma’am.
 

 “A. I apologized to her for what I was about to do. I never touched Ms. Holl-ingsworth. The only thing I was doing was — my concern was about the money. She unbuttoned her shirt and she undid her bra. She never took her bra totally off. She undid her bra, and I told her that was fine, because I thought if she had taken the money, it would either be right here in her bra and would fall out or it would be right here in her pants.
 
 *1174
 
 So she never took her clothes entirely off. She just unbuttoned her shirt and then she unbuckled her bra and just kind of turned it a little bit. She never took her clothes off. And when she started to undo her pants and she took her belt loose, I saw that — I mean, nothing fell out, and I told her to stop. I said, ‘That’s enough.’ I never laid my hands on her. I apologized to her and told her that I had seen enough. So as far as taking her clothes off, no, sir, she never took her clothes totally off. She still had her shirt on and she still had her bra on.”
 

 In regard to her reason for conducting a body search of Hollingsworth, Dixon testified:
 

 “Q. What specific objective facts did you have to believe that Ms. Hollings-worth had taken the money?
 

 “A. Because she was the last one that had the money. It was in her hands. People said she was the last one to have the money. And she had gotten on the telephone and called — called her husband to tell her husband to bring money, that we were accusing her of taking money.
 

 “Q. Okay. And where was the money found?
 

 “A. I happened to find the money, because after we searched Ms. Hollings-worth and came out of the office, we came back into the office and they were bringing up the video. Okay. So her hands were the last ones on there. And we kept watching the video and watching the video and there were hands here and hands there, and the money was put in a brown envelope and she slid the brown envelope behind other envelopes when she should have given it to the officer behind the window. It was in a brown manila envelope with nothing written on it and it was slid behind other envelopes. And I followed the hands on the camera and I was the one that found the envelope.
 

 “Q. Okay. And no one had searched the envelopes prior to you coming upstairs?
 

 “A. Yes, sir, they had. They said they had. Now, I had to take—
 

 “Q. Apparently, they had not.
 

 “A. Apparently, they had not. And that was my problem with — they said they had done everything; but to me, they hadn’t done everything because obviously the money had to be somewhere.
 

 “Q. Okay.
 

 “A. And the reason I searched Ms. Hollingsworth was, I was the ranking officer up there, I was a female, and I felt like we needed to get the situation fixed. It had been going on long enough. And I started with her, but I was fixing to take care of the whole crew.”
 

 On October 4, 2007, Hollingsworth filed her complaint. On March 6, 2009, Dixon and the City filed a motion for a summary judgment, claiming State-agent immunity for Dixon under § 6-5-338, Ala.Code 1975, and
 
 Ex parte Cramnan,
 
 792 So.2d 392, 405 (Ala.2000), and immunity for the City under § 11^7-190, Ala.Code 1975.
 

 Section 6-5-338, Ala.Code 1975, provides, in pertinent part:
 

 “(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, ... created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their
 
 *1175
 
 employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.
 

 “(b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers. No immunity is extended hereby to any private nongovernmental person or entity, including any private employer of a peace officer during that officer’s off-duty hours.”
 

 The City cited
 
 Hilliard v. City of Huntsville,
 
 585 So.2d 889 (Ala.1991), for the premise that § 11-47-190, Ala.Code 1975, limits the liabilities of a municipality to injuries suffered through the neglect, carelessness, or unskillfulness of its agents and claimed immunity because there was no evidence indicating that Dixon had been neglectful, careless, or unskillful in her conduct in searching Hollingsworth.
 

 Hollingsworth filed her response to the summary-judgment motion on March 10, 2009, arguing that because there is no specific written policy that permits Dixon to “strip-search” employees, Dixon is not entitled to State-agent immunity for any liability arising from her search of Holl-ingsworth. She included in her response Montgomery municipal jail policy number 2.80, effective February 13, 2005, which provides guidelines for searches of arres-tees and inmates within the jail. She also included pages 7-9 of the deposition of Maria Jenkins, who witnessed the search at Dixon’s request, in which Jenkins stated that she had been stunned that Dixon was accusing Hollingsworth of taking the money; that, in addition to unbuttoning her blouse and shaking out her bra, Hollings-worth had dropped her pants halfway down; that most of the personnel on the shift had gone so it was unlikely that Dixon intended to search others; and that Hollingsworth seemed stunned, embarrassed, shaken, and confused during the search. Hollingsworth argued that Dixon was not working as a police officer at the time of the incident but was instead working as a supervisor and that “Dixon at the least, misinterpreted regulations and believed incorrectly that strip search policies for inmates and arrestees extended to anyone entering the jail.” As to the liability of the City for Dixon’s actions, Hollings-worth argues that Dixon was clearly negligent, careless, and unskillful in her attempt to resolve the issue of the missing money and that the City is therefore liable under § 11-47-190.
 

 In their March 25, 2009, reply to Holl-ingsworth’s response in opposition to their summary-judgment motion, Dixon and the City reiterated their position that Dixon held the rank of major in the Montgomery Police Department as well as the title of Administration Division Commander. As a major in the Montgomery Police Department, one of Dixon’s responsibilities was to supervise the operation of the Montgomery municipal jail. In performing her responsibility in supervising the operation of the jail, Dixon, in deciding to search Holl-ingsworth, was, they argued, exercising the judgment envisioned by this Court’s decision in
 
 Ex parte Cranman.
 
 They agree with Hollingsworth that a specific policy exists for searching inmates in the jail, but they argue that another general
 
 *1176
 
 policy exists allowing a search of anyone entering the jail, and this is the policy that permitted Dixon’s search of Hollingsworth. Also, citing
 
 Hilliard v. City of Huntsville,
 
 supra, they argued that the City can claim immunity even if Dixon does not prevail on her claim of State-agent immunity.
 

 On March 30, 2009, the trial court heard oral argument on the motion for a summary judgment, and on April 7, 2009, the trial court denied the motion without explanation.
 

 Standard of Review
 

 “Mandamus review of the
 
 denial
 
 of a summary-judgment motion ‘grounded on a claim of immunity’ is an exception to the general rule against interlocutory review of the denial of summary-judgment motions.
 
 Ex parte Auburn Univ.,
 
 6 So.3d 478, 483 (Ala.2008);
 
 Ex parte Hudson,
 
 866 So.2d 1115, 1120 (Ala.2003). In those exceptional cases, ‘[w]e confíne our interlocutory review to matters germane to the issue of immunity. Matters relevant to the merits of the underlying tort claim, such as issues of duty or causation, [we leave] to the trial court....’ 866 So.2d at 1120.”
 

 Ex parte Simpson,
 
 36 So.3d 15, 22 (Ala.2009).
 

 Analysis
 

 As an officer of the Montgomery Police Department, Dixon is a peace officer, whether she was functioning as an administrator, supervisor, or jailer at the time of the incident giving rise to this action. This Court has held that a jailer is a peace officer.
 
 Howard v. City of Atmore,
 
 887 So.2d 201 (Ala.2003).
 

 Further, as an officer of the Montgomery Police Department, Dixon’s duties are “prescribed by law, ... [to] include the enforcement of ... the criminal laws of this state, and [she] is empowered ... to execute warrants, to arrest and to take into custody persons who violate ... the criminal laws of this state.” § 6-5-338(a), Ala. Code 1975.
 

 In
 
 Howard
 
 this Court explained the basis for State-agent immunity for a police officer, Officer Frank Bryars, who was recuperating from surgery and who was on temporary assignment as a jailer/dispatcher when the incident that was the basis for the action occurred:
 

 “By enacting [§ 6-5-338], the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts.
 
 Sheth v. Webster,
 
 145 F.3d 1231, 1237 (11th Cir.1998). Indeed, ‘[t]his statute, by its terms, extends
 
 state-agent
 
 immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties.’
 
 Moore v. Crocker,
 
 852 So.2d 89, 90 (Ala.2002) (emphasis added).
 

 “In
 
 Ex parte Cranman,
 
 [792 So.2d 392 (Ala.2000) ], this Court ‘restated the law of state-agent immunity in Alabama.’
 
 Moore,
 
 852 So.2d at 90. Since
 
 Cran-man,
 
 we analyze immunity issues in terms of ‘State-agent’ immunity, rather than ‘under the dichotomy of ministerial versus discretionary functions.’
 
 Ex parte Hudson,
 
 866 So.2d 1115, 1117 (Ala.2003).
 
 See
 
 also
 
 Giambrone v. Douglas,
 
 874 So.2d 1046, 1052 (Ala.2003);
 
 Ex parte Turner,
 
 840 So.2d 132, 134 n. 1 (Ala.2002). Thus, we will address the applicability of peace-officer immunity under the principles set forth in
 
 Cran-man.
 
 See
 
 Moore,
 
 supra;
 
 Ex parte Duvall,
 
 782 So.2d 244 (Ala.2000).
 

 [[Image here]]
 

 “As a threshold matter, Howard contends that Officer Bryars is not entitled to peace-officer immunity, because, she argues, § 6-5-338(a) does not apply to
 
 jailers.
 
 More specifically, she states:
 
 *1177
 
 ‘Because Bryars was not performing any of the duties
 
 enumerated
 
 in § 6-5-338, but rather was acting as a dispatcher/jailer, he should not be cloaked with § 6-5-338 immunity. His performance of the duties of jailer/dispatcher was outside the “line and scope of his ... law enforcement duties.” ’ Howard’s appellate brief, at 66 (emphasis added). We disagree.
 

 “Simply stated, the statute shields every defendant who (1) is a ‘peace officer,’ (2) is performing ‘law enforcement duties,’ and (3) is exercising judgment or discretion. It is undisputed that Officer Bryars was a sworn law-enforcement officer at the time of Bowens’s suicide, and that he was temporarily serving as a jailer/dispatcher while he was recuperating from surgery. The first element is, therefore, satisfied. The second inquiry is whether the guarding of a city jail by a regular police officer is one of the ‘law enforcement duties’ contemplated by the statute. We answer that question in the affirmative.
 

 “ ‘All cities and towns of this state ... have the power to establish, erect, maintain and regulate jails, ... and to purchase and provide for any and all things which may be deemed advisable or necessary thereto.... ’ Ala.Code 1975, § 11-47-7. Thus, it requires no stretch of logic to conclude that the operation of jails by municipal police departments is a ‘law enforcement’ function. Indeed, this Court has expressly determined that a ‘jailer ... is a peace officer,’ and has adopted the view that the ‘custodian of a convict’ is a ‘law enforcement officer ... engaged in the active discharge of his lawful duty,’ within the meaning of Act No. 746, § 3, Ala. Acts 1967, formerly codified at Ala.Code 1975, § 13-1^42 (criminalizing assault on a ‘peace officer or other law enforcement officer ... engaged in the active discharge of his lawful duty') (repealed by Act No. 607, § 9901, Ala. Acts 1977)....
 
 House v. State,
 
 380 So.2d 940, 941 (Ala.1979). In doing so, this Court explained:
 

 “ ‘ “ ‘Whether those performing [the duties of a correction officer] bear the title of jail guard, warden or correction officer,
 
 overseeing the custody and punishment of law violators is as much a part of law enforcement as undertaking the detection and apprehension of such violators.
 
 Moreover, they have the further
 
 duty of detecting and preventing violations of law by prisoners,
 
 e.g., assaults on other prisoners, escapes, etc., and in that sense are literally law enforcement officers .... ’
 

 “ ‘ . [PJrison guards are ‘law enforcement officers,’ particularly since it is their duty to force the convicts to obey and endure the sentence of the law.” ’
 

 “380 So.2d at 942 (quoting and adopting the reasoning of Presiding Judge Cates in his special concurrence in
 
 Lowe v. State,
 
 54 Ala.App. 280, 285, 307 So.2d 86, 90-91 (1974), which was adopted by the court on rehearing) (emphasis added).
 
 We hold, therefore, that the guarding of a city jail by a regular municipal police officer is a ‘law enforcement dut[y]’ within the meaning of § 6-5-338(a).”
 

 887 So.2d at 203-04 (footnotes omitted)(final emphasis added). Thus, as a municipal police officer with responsibility for the city jail, a law-enforcement duty within the meaning of § 6-5-338(a), Dixon is within the umbrella of protection provided to peace officers by § 6-5~338(a).
 

 Dixon is also entitled to State-agent immunity under the
 
 Cranman
 
 factors. In
 
 Cranman,
 
 we said:
 

 “A State agent
 
 shall
 
 be immune from civil liability in his or her personal ca
 
 *1178
 
 pacity when the conduct made the basis of the claim against the agent is based upon the agent’s
 

 “(1) formulating plans, policies, or designs; or
 

 “(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as: “(a) making administrative adjudications;
 

 “(b) allocating resources;
 

 “(c) negotiating contracts;
 

 “(d) hiring, firing, transferring, assigning, or supervising personnel; or
 

 “(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 

 “(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
 

 “(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
 

 “Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent
 
 shall not
 
 be immune from civil liability in his or her personal capacity
 

 “(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 

 “(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.”
 

 792 So.2d at 405.
 

 In her response to Dixon and the City’s petition, Hollingsworth says that “the facts are undisputed that Ms. Dixon was purportedly acting as a supervisor of jail employees at the time of the incident.” Hollingsworth’s brief, at 12. “Dixon was purportedly performing her administrative duties as an administrator of the jail and not a peace officer enforcing the laws.” Hollingsworth’s brief, at 13. Hollings-worth asserts that
 
 Ex parte Kennedy,
 
 992 So.2d 1276 (Ala.2008), expands the rule set forth in
 
 Cranman
 
 to encompass § 6-5-338(a) but that the State-agent immunity is available only if the person seeking immunity was performing a discretionary function within the line and scope of his or her law-enforcement duties. She quotes a portion of
 
 Kennedy
 
 to support her thesis:
 

 “ ‘ “A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala.Code 1975.” ’ ”
 

 Hollingsworth’s brief, at 11 (quoting
 
 Ex parte Kennedy,
 
 992 So.2d at 1282, quoting in turn
 
 Hollis v. City of Brighton,
 
 950 So.2d 300, 309 (Ala.2006)).
 
 [3]
 
 As demon
 
 *1179
 
 strated above, “the guarding of a city jail by a regular municipal police officer is a ‘law enforcement dut[y]’ within the meaning of § 6-5-338(a),”
 
 Howard,
 
 887 So.2d at 204, and Dixon was such an officer who was responsible for guarding the city jail through her subordinates. Moreover, Dixon was exercising her judgment in the administration of a department of government when she determined, as the supervisor of the officer employees, that the matter of the missing money required an expeditious resolution. Furthermore, Dixon did not act “beyond ... her authority,” because the standard-operating-procedures manual provided that “[ejvery person entering this facility is subject to be searched at any time.” - As a State agent, Dixon is therefore immune from tort liability.
 

 The City is also immune. “ ‘It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6 — 5—338(b), the city by which he is employed is also immune.’ ”
 
 City of Crossville v. Haynes,
 
 925 So.2d 944, 955 (Ala.2005) (quoting
 
 Howard,
 
 887 So.2d at 211). See also
 
 Thurmond v. City of Huntsville,
 
 904 So.2d 314, 326 (Ala.2004);
 
 Ex parte City of Gadsden,
 
 781 So.2d 936, 940 (Ala.2000).
 

 Conclusion
 

 Both Dixon and the City have demonstrated that they are immune from tort liability and thus have demonstrated a clear legal right to the writ of mandamus. Accordingly, the petition is granted and the Montgomery Circuit Court is directed to vacate its April 7, 2009, order denying Dixon and the City’s motion for a summary judgment and to dismiss the complaint against them.
 

 PETITION GRANTED; WRIT ISSUED.
 

 LYONS, STUART, SMITH, BOLIN, and SHAW, JJ., concur.
 

 WOODALL and MURDOCK, JJ., concur in the result.
 

 COBB, C.J., recuses herself.
 

 [1]
 

 .
 

 "Generally, the departments and subordinate entities of municipalities, counties, and towns that are not separate legal entities or bodies do not have the capacity to sue or be sued in the absence of specific statutory authority.... Among subordinate entities generally lacking the capacity to sue or be sued separately are police departments. ..."
 

 56 Am.Jur.2d
 
 Municipal Corporations
 
 § 787 (2000).
 

 [2]
 

 . The standard-operating-procedures manual for the Montgomery municipal jail includes a policy that reads, in part:
 

 "Every Municipal Jail employee is to read and be familiar with the Montgomery Police Department's Manual of Rules and Regulations as it states in Article II Section 2.058.
 

 "The following is a standard operating procedures manual that the employees of the Municipal Jail will follow.
 

 [[Image here]]
 

 "Every person entering this facility is subject to be searched at any time.”
 

 [3]
 

 . In
 
 Hollis v. City of Brighton,
 
 this Court modified the fourth
 
 Cranman
 
 factor to reflect
 
 *1179
 
 § 6-5-338(a) by adding the following language: "or serving as peace officers, under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala.Code 1975.” 950 So.2d at 309.