Matthew Kennedy, Charles Ward, and Marty Griffin, law-enforcement officers, petition this Court for a writ of mandamus directing the Escambia Circuit Court to enter a summary judgment in their favor on a wrongful-death claim pursued by Burl Thompson, as the executor of the estate of Joseph James "Pete" Thompson ("Pete Thompson"), based on their assertion of the defenses of State-agent and statutory immunity. For the reasons discussed herein, we grant the petition and issue the writ.
 I. Factual and Procedural Background
On the afternoon of September 30, 2002, 83-year-old Pete Thompson, who apparently was suffering from some form of mental illness and had become angry that automobiles were speeding on the road next to his house, fired a shotgun at a passing automobile, striking the wind-shield. His brother, Burl Thompson, who lived with him and who was cutting the grass at the time, tried to retrieve the gun from Pete. Pete refused to turn the gun over to Burl and entered the house.
Shortly thereafter, law-enforcement officers with the Escambia County Sheriff's Office came to the Thompsons' property. They remained about 200 yards from the house. The officers contacted Burl by telephone and asked him to try to convince Pete to speak with them. When Pete refused, they asked Burl to come outside and talk to them, which Burl did. He stayed with the officers until around 9:00 p.m., at which time he left the scene.
After the officers from the Escambia County Sheriff's Office were unable to convince Pete to leave his house, they requested assistance from a tactical unit of the Alabama Department of Public Safety.[1] *Page 1278 
They also obtained a felony warrant for Pete's arrest.
Upon receiving notification that the Escambia County Sheriff's Office had requested the assistance of a tactical unit, Sgt. Marty Griffin, [2] a state trooper and the team leader of the tactical unit, notified the other members of the tactical unit, and the unit proceeded to the scene of the incident. Among those responding were Lt. Charles Ward, who was Sgt. Griffin's superior officer, and State Trooper Matthew Kennedy, who was deployed at the scene as a marksman and observer.
Two members of the Alabama Bureau of Investigation, Cpl. Doug Darby and Cpl. Stan Stabler, both state troopers, came to the scene to serve as crisis negotiators. Cpl. Darby and Cpl. Stabler attempted to contact Pete by telephone several times. Pete, who was watching television in his living room with his shotgun at his feet, did not answer their telephone calls and did not in any way communicate with them. At 9:00 p.m., the decision was made to cut the antenna cable to the television in the hope that if the television was disabled Pete would answer his telephone and talk with the negotiators. However, after one of the officers cut the antenna cable, Pete, instead of talking with the negotiators, turned off the television and turned out the light in the living room.
Around midnight, the officers determined that Pete might have gone to bed. They decided to enter the house from the front of the house in an attempt to apprehend him. The decision was made that if Pete was not in bed as expected, the team entering the house would exit the house so as to prevent a confrontation. The team entered the house through the front as planned, and, upon seeing that Pete's bed was empty, left the house. As the team left the house, Pete fired on the officers. No one was injured.
Following the unsuccessful attempt to apprehend Pete, Cpl. Stabler, Cpl. Darby, and Sgt. Griffin moved the tactical unit's van to the front of Pete's house. They directed the blue lights and headlights toward the house in an attempt to ensure that Pete knew it was law-enforcement officers who were attempting to talk to him. Cpl. Stabler and Cpl. Darby used the public-address system in the van to try to communicate with Pete. He did not respond.
At approximately 3:30 a.m. on the morning of October 1, 2002, the officers fired two rounds of tear gas into the house in an attempt to coerce Pete to leave the house.[3] Cpl. Stabler and Cpl. Darby continued to attempt to communicate with Pete, to no avail. Following the initial introduction of tear gas into the house, the officers fired three more rounds of tear gas into the house.
Shortly after the officers fired the last round of tear gas into the house, Pete walked out of the house and onto the front porch. As he was leaving the house, he opened fire on the officers. He reloaded his shotgun and continued firing on the officers, ignoring repeated requests that he drop his gun. Several of the officers took cover. In an affidavit, Trooper Kennedy *Page 1279 
described what transpired during Pete's attack on the officers:
 "There was a lot of noise from the shotgun blasts and shouting of the officers who were under attack. Over all of the noise, I heard Sergeant Griffin say `if you have a shot, take it.' I had never shot anyone before but I knew one of us was likely to be severely hurt or killed unless something was done. I did the only thing I could at the time to protect us. I made the decision to take the shot. I fired the shot and hit [Pete]. That was the only shot fired by the officers."
Pete died from the gunshot wound. One of the officers on the scene received a minor wound to the ankle as a result of Pete's firing on the officers.
On July 8, 2004, Burl Thompson, as executor of Pete's estate, sued Trooper Kennedy and numerous fictitiously named defendants, alleging wrongful death and the tort of outrage. In his answer, Trooper Kennedy denied the material allegations of the complaint and asserted, among other defenses, the affirmative defenses of State-agent[4] and statutory immunity.
In December 2005, Burl moved to amend his complaint to substitute Lt. Ward and Sgt. Griffin for two of the fictitiously named defendants. The fictitiously named defendants for whom they were substituted were alleged, in the original complaint, to have been "members of the [tactical unit] who acted maliciously, willfully, and in bad faith by failing to follow the department's . . . Standard Operating Procedure" and to have been "department heads and supervisors who willfully, maliciously and in bad faith failed to train and supervise properly the members of the [tactical unit]." The complaint, as amended, asserted the same two counts against Lt. Ward and Sgt. Griffin, wrongful death and the tort of outrage, as were asserted in the original complaint against Trooper Kennedy. In their answer to the amended complaint, Lt. Ward and Sgt. Griffin, like Trooper Kennedy, denied the material allegations of the complaint and asserted the affirmative defenses of State-agent and statutory immunity.
On November 2, 2006, Trooper Kennedy, Lt. Ward, and Sgt. Griffin filed a motion for a summary judgment. They argued that they were immune from suit under the doctrine of State-agent immunity and under Ala. Code 1975, § 6-5-338(a), which provides that, with certain exceptions, "[e]very peace officer . . . shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Burl responded by arguing that immunity was not available to the defendants because, he alleged, they had failed to follow established guidelines in attempting to effect Pete's arrest.
On May 18, 2007, the trial court granted the summary-judgment motion as to the tort-of-outrage claim, but it denied the motion as to the wrongful-death claim.
On June 26, 2007, Trooper Kennedy, Lt. Ward, and Sgt. Griffin filed a petition for a writ of mandamus with this Court, seeking an order directing the trial court to grant that portion of their summary-judgment motion directed to the wrongful-death claim. *Page 1280 
 II. Standard of Review
We apply the following standard of review to mandamus proceedings challenging the denial of a motion for a summary judgment based on a claim of immunity:
 "`While the general rule is that the denial of a motion for summary judgment is not reviewable, . . . the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus.' Ex parte Rizk, 791 So.2d 911, 912 (Ala. 2000). A writ of mandamus is an extraordinary remedy available only when there is: `(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.' Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala. 2001)."
Ex parte Nail, 879 So.2d 541, 543 (Ala. 2003).
 III. Analysis
Trooper Kennedy, Lt. Ward, and Sgt. Griffin contend that the trial court erred when it denied their motion for a summary judgment as to the wrongful-death claim because, they argue, they are entitled to immunity in this case based on State-agent immunity and the immunity provided by Ala. Code 1975, § 6-5-338, for law-enforcement officers. Burl contends in response that the officers are not entitled to immunity from the wrongful-death claim because, he says, several of their actions during the evening and morning of the incident resulting in Pete's death violated what he says are binding rules and regulations set forth in a training manual used by the Department of Public Safety at its academy for law-enforcement officers. For the reasons stated herein, we agree with the officers that they are immune from Pete's estate's wrongful-death claim, and we issue the writ.
"State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." Ex parte Hayles, 852 So.2d 117,122 (Ala. 2002). In Ex parte Cranman, 792 So.2d 392
(Ala. 2000), a plurality of this Court articulated the following test for State-agent immunity:
 "A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
 "(1) formulating plans, policies, or designs; or
 "(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
 "(a) making administrative adjudications;
 "(b) allocating resources;
 "(c) negotiating contracts;
 "(d) hiring, firing, transferring, assigning, or supervising personnel; or
 "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 "(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
 "(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, *Page 1281 
counseling or releasing persons of unsound mind, or educating students.
 "Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
 "(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 "(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
Cranman, 792 So.2d at 405 (emphasis on "shall" and "shall not" original; other emphasis added). The Court adopted the Cranman test for State-agent immunity in Exparte Butts, 775 So.2d 173, 177-78 (Ala. 2000).
As noted, the officers also rely on § 6-5-338(a), Ala. Code 1975, which provides immunity for law-enforcement officers:
 "Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."
Although § 6-5-338(a) speaks in terms of immunity for "discretionary functions," this Court, in Blackwood v. Cityof Hanceville, 936 So.2d 495 (Ala. 2006), held that the test for determining whether an officer is entitled to immunity under § 6-5-338(a) is the one articulated in Cranman
relating to State officers. In Blackwood, we stated:
 "Before Cranman, the immunity accorded a peace officer under § 6-5-338(a) was analyzed in terms of whether at the time of the act complained of the officer was engaged in the performance of a discretionary act.
 ". . . .
 "However, `[w]hether a qualified peace officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by Ex parte Cranman, 792 So.2d 392 (Ala. 2000). . . .' Hollis [v. City of Brighton] 885 So.2d [135,] 143 [(Ala. 2004)].
 "`By enacting [§ 6-5-338], the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts. Sheth v. Webster, 145 F.3d 1231, 1237 (11th Cir. 1998). Indeed, "[t]his statute, by its terms, extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties." Moore v. Crocker, 852 So.2d 89, 90
(Ala. 2002) (emphasis added). *Page 1282 
 "`In Ex parte Cranman, supra, this Court "restated the law of state-agent immunity in Alabama." Moore, 852 So.2d at 90. Since Cranman, we analyze immunity issues in terms of "State-agent" immunity, rather than "under the dichotomy of ministerial versus discretionary functions." Ex parte Hudson, 866 So.2d 1115, 1117 (Ala. 2003). See also Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003); Ex parte Turner, 840 So.2d 132, 134 n. 1 (Ala. 2002). Thus, we will address the applicability of peace-officer immunity under the principles set forth in Cranman. See Moore, supra; Ex parte Duvall, 782 So.2d 244 (Ala. 2000).'
"Howard [v. City of Atmore, 887 So.2d 201,] 203 [(Ala. 2003)]."
Blackwood, 936 So.2d at 504.
Despite this Court's holding in Blackwood, there remained the fact that the scope of immunity for law-enforcement officers as articulated in § 6-5-338(a) was broader than category (4) of the Cranman test seemed to allow. InHollis v. City of Brighton, 950 So.2d 300, 309
(Ala. 2006), this Court eliminated that apparent difference by expanding the scope of immunity as stated in category (4) of theCranman test:
 "Given the divergence between the scope of the immunity granted by § 6-5-338(a) — `conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties' — and summarized in category (4) of the Cranman restatement — `exercising judgment in the enforcement of the criminal laws of the State. . . .' — we conclude that immune category 4 of the Cranman restatement should be expanded to restate the law of immunity in this area so as to reflect § 6-5-338(a).
 "Because the peace officers' immunity statute does not limit the availability of immunity to `enforcement of the criminal laws,' we today modify category (4) of Cranman to read as follows:
 "`A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
 "`. . . .
 "`(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975.'
"(Additional language emphasized.)"
Hollis, 950 So.2d at 309.
"This Court has established a `burden-shifting' process when a party raises the defense of State-agent immunity." Ex parteEstate of Reynolds, 946 So.2d 450, 452 (Ala. 2006). A State agent asserting State-agent immunity "bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity."946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized inCranman is applicable. The exception being argued here is that "the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority."946 So.2d at 452. One of the ways in which a plaintiff can show that a State agent acted beyond his or her authority is by proffering evidence that the State agent failed "`to discharge duties pursuant to detailed rules or regulations, such as those stated *Page 1283 
on a checklist.'" Giambrone v. Douglas,874 So.2d 1046, 1052 (Ala. 2003) (quoting Ex parte Butts,775 So.2d at 178).
In the present case, we have no difficulty concluding that Trooper Kennedy, Lt. Ward, and Sgt. Griffin carried their burden of demonstrating that, at the times relevant to this matter, they were engaged in law-enforcement functions for which statutory and State-agent immunity would be available, barring the applicability of one of the two categories of exceptions to immunity recognized in Cranman. The portions of the trial court proceedings the parties have placed before this Court on this mandamus petition demonstrate: (1) that the officers were present at the scene to arrest Pete pursuant to a warrant; (2) that they were attempting, generally, to enforce the criminal laws of the State; and (3) that the actions they took during their standoff with Pete were within the line and scope of their law-enforcement duties, either, in the case of Lt. Ward and Sgt. Griffin, as supervisors of the tactical unit, or, in the case of Trooper Kennedy, as a member of the tactical unit.[5] Given this showing, to defeat the officers' summary-judgment motion as to the wrongful-death claim, Burl had the burden of demonstrating that an exception to State-agent immunity applied. See Estate of Reynolds,946 So.2d at 452.
Burl contended to the trial court, and contends here, that the officers acted beyond their authority with regard to the incident in question because, he alleges, in handling the situation, they violated binding rules and regulations.[6] The rules and regulations they violated, he argues, are set forth in a training manual for tactical units used in the Department of Public Safety's academy for law-enforcement officers; the manual is known as the "Nighthawk manual."
One passage of the training manual states: "Aneffective team requires a minimum of three negotiators." This "rule" was violated, Burl argues, because only two negotiators, Cpl. Darby and Cpl. Stabler, were on the scene during the standoff. Another passage states: "Non-hostage situations are often made worse by a confrontative police profile that threatens and agitates the subject. This approach causes a defensive response that inhibits building trust and rapport, and may escalate the conflict." Burl argues that the officers violated this "rule" when, thinking Pete was asleep, they attempted to enter the house and later when they fired tear gas into the house. A final passage in the training manual to which Burl refers states: "Non-threatening
negotiations can be undermined by a simultaneous demonstration of force." He argues that "[t]hat is exactly what happened in this case while the negotiators were trying to end the matter peacefully."
Burl relies on the deposition testimony of State Trooper Capt. Herman Wright, the designated deponent under Rule 30(b)(6), Ala. R. Civ. P., for the Department of Public Safety, to support his argument that the above-quoted passages from the Nighthawk manual constitute binding rules and regulations, the violation of which by an officer results in his or her *Page 1284 
loss of immunity. Specifically, he recites the following passages from Capt. Wright's deposition:
 "Q. Tell me what the Nighthawk manual is.
 "A. That's a manual that they use for their basic training trying to give them guidance or guidelines on what to do about certain situations or how it would be — how it would be handled.
 ". . . .
 "Q. Captain, how many negotiators are recommended for each operation? In what minimum number? Operation being a barricaded situation like the one we have in this case.
 "A. You're testing my memory. I — I went over the policy. I believe it's three.
 ". . . .
 "Q. — they should not aggravate the subject while they're being — trying — the negotiations are going on. And if the — Well, if the Nighthawk training manual said that, it'd be correct, wouldn't it?
 "A. That would be their procedure if the — if the manual said that.
 "Q. If the manual said that, that's the way it should be done?
 "A. That would be the guidelines, yes, sir."
(Emphasis added.)
Trooper Kennedy, Lt. Ward, and Sgt. Griffin argue that the training manual does not constitute binding rules and regulations. Rather, they point to two policy orders of the Department of Public Safety as providing the appropriate rules and regulations governing the incident in this case. The first, Policy Order No. 411, has as its subject "Crisis/Hostage Situations" and as its purpose "[t]o establish guidelines for the Department of Public Safety response to incidents involving hostages, barricaded suspects and other crisis situations." The other, Policy Order No. 201, has as its subject "Use of Force," and as its purpose "[t]o provide sworn officers of the department with guidelines on the use of force and establish use of force reporting procedures." These policy orders, and not the training manual, argue Trooper Kennedy, Lt. Ward, and Sgt. Griffin, provided the rules and regulations they were to follow during the incident resulting in this litigation.
In Giambrone v. Douglas, supra, and Howard v.City of Atmore, 887 So.2d 201 (Ala. 2003), this Court discussed the violation-of-rules basis for denying a State agent immunity. We described those cases in Gowens v. Tys.,948 So.2d 513, 524-26 (Ala. 2006):
 "`The complaint in Giambrone [v. Douglas, 874 So.2d 1046 (Ala. 2003),] sought compensation for injuries suffered by 15-year-old Jake Giambrone, a member of the wrestling team, in an impromptu wrestling match with Michael Douglas, the head wrestling coach for Auburn High School. 874 So.2d at 1049. Douglas outweighed Giambrone, who was a freshman, by approximately 70 pounds. Id. The trial court entered a summary judgment in favor of Douglas on the ground of State-agent immunity.
 "`In this Court, the appellant argued that the summary judgment was improper, because there was evidence indicating that "[Douglas] violated the competition guidelines as promulgated by the National Federation of Wrestling (`NFW'); and . . . engaged in `inequitable competition' with Jake in violation of the code of conduct contained in the Alabama High School Athletic Directors and Coaches Association Directories (`the Athletic Directories')." 874 So.2d at 1051 (emphasis added). This Court agreed with that argument and reversed the summary judgment. 874 So.2d at 1057.
 "`In doing so, the Court noted that, as a general principle, "Douglas was permitted *Page 1285 
to exercise broad judgment in the education of his students." 874 So.2d at 1053. It explained, however, that Douglas's supervisor, the athletic director, had "instructed the coaches . . . to follow the guidelines in the Athletic Directories," and that he had "provided Douglas with a book containing rules promulgated by the NFW in order to make sure that Douglas knew the rules for conducting wrestling matches." 874 So.2d at 1054. The Court stated:
 "`"Although [the athletic director] was not directed by the [Auburn City Board of Education] to impose on the coaches at Auburn High School the guidelines and rules of the . . . NFW and the Athletic Directories, it was within the exercise of his judgment to `insist' that the coaches comply with those guidelines and rules.
 "`"Therefore, Douglas's `broad authority' to exercise judgment in the safe conduct of his wrestling team practices was limited by the guidelines and rules furnished and imposed by [the athletic director]."
 "`874 So.2d at 1054. The Court concluded:
 "`"The guidelines and rules removed Douglas's judgment in determining whether he should participate in a `full speed' challenge match with a student who was less experienced, much younger, and smaller than Douglas. Moreover, the guidelines and rules restricted the type of moves that are permissible in the sport of wrestling. Because a trier of fact could determine that Douglas performed an illegal move during an `inequitable' challenge match, thereby failing to discharge his duties pursuant to `detailed rules or regulations,' we cannot determine at this stage in the proceedings that Douglas is entitled to State-agent immunity. Douglas did not meet his burden of establishing that his actions and decisions involved functions that entitled him to immunity."'
 "Howard [v. City of Atmore,] 887 So.2d [201,] 208 [(Ala. 2003)] (emphasis added in Howard).
 "More recently, in Howard we considered the claims of Gladys Howard against police officer/dispatcher Frank Bryars for the death of Howard's sister, Marilyn Bowens, who committed suicide while she was incarcerated in the City of Atmore jail. 887 So.2d at 202. We agreed with Howard's theory of the case that Officer Bryars was not entitled to State-agent immunity, `because . . . he failed to follow mandatory rules and procedures
prescribed by the . . . police department for observing inmates,' which were set forth in the `"Standard Operating Procedures Manual"' (`the SOP'). 887 So.2d at 206.
 "The dispositive provision of the SOP stated, in pertinent part: `"The dispatcher on duty shall make periodic jail checks on inmates at least twice an hour and more often if needed or circumstances call for additional checks. The monitor camera will constantly be operating and observed by dispatchers."' 887 So.2d at 207 (emphasis added in Howard). There was testimony that Officer Bryars had `made a "jail check" on all the inmates when he arrived at 3:00 p.m. to begin his shift,' and `that he saw Bowens on the "monitor camera" [only] once between 3:00 p.m. and 4:08 p.m.,' when she was discovered `hanging from the bars' of her cell. 887 So.2d at 209. Thus, summary judgment for Officer Bryars was inappropriate, in the face of evidence indicating that he `failed to comply with [the SOP], which require[d him] to make "jail checks" of all inmates at least twice per hour, and "constantly" to observe the "monitor camera."' 887 So.2d at 209 (first emphasis added)." *Page 1286 
We agree with Trooper Kennedy, Lt. Ward, and Sgt. Griffin that Burl failed to carry his burden of demonstrating that they failed "to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." It is clear from the materials submitted to us that neither the Department of Public Safety nor any authorized agent of the Department adopted the training manual upon which Burl relies as binding rules and regulations that strictly govern the tactical unit. Capt. Wright's testimony that the training manual set forth "guidelines" and "procedures" and that it indicated what the tactical-unit team members "should do" in particular circumstances does not mean that the training manual was adopted as a set of binding rules and regulations strictly governing the tactical unit. Indeed, it is in the nature of a training manual to explain to an employee how to handle situations and to set forth guidelines for how an employee "should" conduct himself or herself. Further, as highlighted by the words or passages emphasized in our earlier quotation of the specific provisions in the training manual upon which Burl seeks to rely, each of those provisions is either aspirational in nature or leaves the actor with discretion as to whether the guidance should be followed in a given situation.[7] Under these circumstances, we are unwilling to recognize the Nighthawk manual as a set of "detailed rules and regulations," the violation of which will cause a State agent to lose his or her immunity from an action seeking money damages.
 IV. Conclusion
Based on the foregoing, we conclude that, with regard to the wrongful-death claim asserted against them, Trooper Kennedy, Lt. Ward, and Sgt. Griffin are entitled to State-agent immunity and to the immunity provided by Ala. Code 1975, § 6-5-338(a). As a result, we conclude that the trial court erred when it denied their motion for a summary judgment as to that claim. Thus, we issue the writ. The trial court is directed to set aside that portion of its order denying the motion for a summary judgment on the wrongful-death claim and to enter a summary judgment as to that claim.
PETITION GRANTED; WRIT ISSUED.
LYONS, STUART, BOLIN, and PARKER, JJ., concur.
COBB, C.J., recuses herself.
[1] A tactical unit is specially trained in the use of firearms and tactical techniques.
[2] Since the time of the incident that is the basis of this action, Griffin has become a lieutenant with the Department of Public Safety.
[3] In an affidavit, Lt. Ward explained why the officers attempted to end the situation before daybreak: "For the safety of team members we were attempting to resolve the situation prior to sunrise. The house was in the open, near a well-traveled road and when the sun came up we would lose the cover of darkness and the team's positions would be exposed."
[4] In his answer, Trooper Kennedy asserted the defense of "common law discretionary function immunity." "Discretionary-function immunity is now referred to as State-agent immunity." Wilson v. Manning,880 So.2d 1101, 1108 (Ala. 2003).
[5] Indeed, before neither the trial court nor this Court did Burl contend that the officers had not carried the initial burden of demonstrating that they were engaged in activities for which, in the absence of an applicable exception, immunity would be available.
[6] In his brief, Burl also states that "the actions of the defendants [were] willful and malicious." Burl fails to explain how this was so or to elaborate in any way on this legal conclusion. Our own review of those portions of the trial court's proceedings before us fails to support this bald assertion.
[7] It may also be noted in regard to the first of the above-quoted training-manual provisions (requiring a minimum of three negotiators for an "effective" team), that Policy Order No. 411 states that "[a] negotiation team will ideally
consist of the following personnel: 1. Primary negotiator; 2. Secondary negotiator/negotiation team leader; 3. Investigation/intelligence officer."