MURDOCK, Justice.
 

 The City of Montgomery (“the City”) and Montgomery Police Department (“MPD”) officers K.C. Bentley (“Officer Bentley”) and Ron Cook (“Lt. Cook”) petition this Court for a writ of mandamus directing the Montgomery Circuit Court to enter a summary judgment in their favor on claims of negligence, intentional infliction of emotional distress, libel per se, slander per se, invasion of privacy, and loss of consortium pursued by Gwendolyn P. McQuirter and Charles E. McQuirter, based on the assertion of the defenses of State-agent and statutory immunity by Officer Bentley, Lt. Cook, and the City. For the reasons discussed herein, we grant the petition and issue the writ.
 

 I. Factual and Procedural Background
 

 On September 15, 2006, the special-operations division of the MPD conducted a prostitution sting in the area of the Mobile Highway and West South Boulevard in Montgomery. That day, undercover MPD officers arrested 10 women, who were taken to a predetermined location for processing. Officer Bentley was part of the processing team responsible for completing an incident/offense report, performing warrant checks on the individuals arrested, and preparing affidavits from the statements of the arresting officers. Officer Bentley also had to prepare a daily activity report for her superiors, which included booking photographs of each person arrested, the person’s name, the date of the person’s arrest, the location of the arrest, the specific charge, and the person’s criminal history as retrieved from the National Crime Information Center (“NCIC”).
 

 One of the women arrested as a result of the prostitution sting was Tiffany Riley. Riley sat near Officer Bentley as Officer Bentley took information from Riley for the processing paperwork.
 
 [1]
 
 Officer Bentley asked Riley for her name, and Riley responded by giving Officer Bentley the name Gwendolyn McQuirter and correctly
 
 *840
 
 spelling the name.
 
 [2]
 
 Officer Bentley asked Riley’s date of birth, and Officer Bentley testified that Riley provided Gwendolyn McQuirter’s correct date of birth. In an affidavit Riley filed in the trial court, however, Riley stated that she provided her own date of birth to Officer Bentley. When Officer Bentley asked for Riley’s address, Riley provided Gwendolyn McQuirter’s correct address. Officer Bentley also asked for Riley’s Social Security number. Officer Bentley testified that Riley stated that she could not recall her Social Security number, although Riley stated in her affidavit that she provided her son’s Social Security number. As Riley provided the information, Officer Bentley entered it into a police computer system that, according to Officer Bentley, verified McQuirter’s address and date of birth as provided by Riley, so Officer Bentley had no reason to suspect that Riley was not Gwendolyn McQuirter.
 

 In the course of preparing the daily activity report for September 15, 2006, Officer Bentley waited for booking photographs to include in the report, but for some unknown reason, none were placed in the MPD’s computer system. As a result, Officer Bentley decided to use file photographs of each of the arrested women so that she could timely submit the daily activity report to her superiors. All the women, except McQuirter, had booking photographs on file because they had been previously arrested. To obtain a photograph of McQuirter, Officer Bentley accessed the Law Enforcement Tactical System (“LETS”), a computerized system that contains data from the records of several different agencies, including the Department of Public Safety, from which Officer Bentley obtained Gwendolyn McQuirter’s driver’s license photograph. Officer Bentley testified that MPD officers often use LETS to obtain information, including photographs, as an investigative tool and for other law-enforcement purposes. She also testified that at the time she pulled Gwendolyn McQuirter’s photograph from LETS, it did not occur to her that the person in the photograph looked substantially different than Riley.
 

 Officer Bentley completed her daily activity report and delivered it to her superiors, one of whom was Lt. Pat Crockett. Lt. Crockett then contacted Lt. Cook and informed him that arrest information and photographs from the prostitution sting operation were ready to be disseminated to the media. Lt. Cook, a detective, also serves as an on-call public information officer (“PIO”). The PIO disseminates information from the MPD to the media, typically through press releases. The MPD uses the PIO when it feels an incident is of significant public interest, if it is seeking to expose a public-safety issue via the media, or if it is actively seeking a criminal suspect. Lt. Cook was the acting PIO on the weekend of the prostitution sting operation. Upon receiving the call from Lt. Crockett, Lt. Cook immediately picked up the information and accompanying photographs from him and prepared a press release. Lt. Cook testified that he did not find it abnormal that McQuirter’s photograph was not a booking photograph like the rest of the photographs because it was not unusual to have different kinds of photographs submitted in police reports.
 

 On September 16, 2006, Lt. Cook issued a press release announcing the details of the sting operation, including the names and photographs of the 10 women arrested the previous day. The list included the
 
 *841
 
 name Gwendolyn McQuirter, and her name was accompanied by her driver’s license photograph. The press release was distributed to several Montgomery television stations, to the Associated Press, and to the Montgomery Advertiser, a local newspaper. Two Montgomery television stations ran stories about the prostitution sting operation in broadcasts airing on September 17,18, and 19, 2006; the broadcasts showed Gwendolyn McQuirter’s photograph and identified her by name as 1 of the 10 women arrested for prostitution. The Montgomery Advertiser published a story regarding the arrests on September 17, 2006; the story directed readers to view photographs of the suspects, which included a photograph of Gwendolyn McQuirter, on its Web site.
 

 On September 19, 2006, Charles McQuirter contacted Lt. Cook in reference to the release to the media of the photograph of his wife, and, upon further checking, the MPD discovered that Riley had falsely identified herself during her processing following her arrest. As a result, Riley was charged with, and on September 20, 2006, pleaded guilty to, giving a false name to a law-enforcement officer.
 

 In February 2007, the McQuirters sued the City and several other defendants in the Montgomery Circuit Court. They subsequently amended their complaint. As ultimately amended, the complaint contained state claims alleging negligence, intentional infliction of emotional distress, libel per se, slander per se, invasion of privacy, and loss of consortium, and claims alleging violation of the Driver Privacy Protection Act, 18 U.S.C. §§ 2721-2725, and a violation of 42 U.S.C. § 1983. In a second amended complaint, the McQuirt-ers added Officer Bentley and Lt. Cook (“the officers”) as defendants. The defendants removed the case to federal court. On February 12, 2008, the federal district court entered a summary judgment in favor of all the defendants on the federal claims and declined to extend jurisdiction to hear the state-law claims. The federal district court then remanded the action to the Montgomery Circuit Court.
 

 On May 29, 2008, the City and the officers filed a renewed motion for a summary judgment based on statutory and State-agent immunity. The trial court denied the motion. Thereafter, the City and the officers petitioned this Court for a writ of mandamus directing the trial court to set aside its order denying their motion for a summary judgment and to enter an order granting the motion.
 

 II. Standard of Review
 

 “ ‘
 
 “While the general rule is that the denial of a motion for summary judgment is not reviewable, ... the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus.”
 
 Ex parte Rizk,
 
 791 So.2d 911, 912 (Ala.2000). A writ of mandamus is an extraordinary remedy available only when there is: “(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.”
 
 Ex parte BOC Group, Inc.,
 
 823 So.2d 1270, 1272 (Ala.2001).’ ”
 

 Ex parte Kennedy,
 
 992 So.2d 1276, 1280 (Ala.2008) (quoting
 
 Ex parte Nall,
 
 879 So.2d 541, 543 (Ala.2003)) (emphasis omitted).
 

 III. Analysis
 

 A. Claims Against the Officers
 

 The officers contend that the trial court erred when it denied their motion for a summary judgment as to the McQuirters’
 
 *842
 
 claims because, they argue, they are entitled to immunity in this case based on State-agent immunity and the statutory immunity for law-enforcement officers provided by § 6-5-338, Ala.Code 1975.
 

 “State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities.”
 
 Ex parte Hayles,
 
 852 So.2d 117, 122 (Ala.2002). A plurality of this Court clarified the parameters of State-agent immunity in
 
 Ex parte Cranman,
 
 792 So.2d 392 (Ala.2000), and this Court adopted the
 
 Cranman
 
 test later the same year in
 
 Ex parte Butts,
 
 775 So.2d 173 (Ala.2000). In
 
 Cranman,
 
 this Court stated:
 

 “A State agent
 
 shall
 
 be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
 

 “(1) formulating plans, policies, or designs; or
 

 “(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
 

 “(a) making administrative adjudications;
 

 “(b) allocating resources;
 

 “(c) negotiating contracts;
 

 “(d) hiring, firing, transferring, assigning, or supervising personnel; or
 

 “(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 

 “(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
 

 “(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.”
 

 Cranman,
 
 792 So.2d at 405.
 

 As noted, the officers also rely on § 6-5-338(a), Ala.Code 1975, which states:
 

 “Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.”
 

 Although § 6-5-338(a) addresses immunity in terms of “discretionary functions,” this Court, in
 
 Blackwood, v. City of Hanceville,
 
 936 So.2d 495 (Ala.2006), concluded that the test for determining whether an
 
 *843
 
 officer is entitled to immunity under § 6-5-338(a) is the one articulated in
 
 Cran-man. See Blackwood,
 
 936 So.2d at 504 (quoting
 
 Howard v. City of Atmore,
 
 887 So.2d 201, 203 (Ala.2003), for the proposition that this Court “ ‘will address the applicability of peace-officer immunity under the principles set forth in
 
 Cran-man
 
 ’ ”). This Court has also stated:
 

 “Despite this Court’s holding in
 
 Blacktoood,
 
 there remained the fact that the scope of immunity for law-enforcement officers as articulated in § 6-5-338(a) was broader than category (4) of the
 
 Cranman
 
 test seemed to allow. In
 
 Hollis v. City of Brighton,
 
 950 So.2d 300, 309 (Ala.2006), this Court eliminated that apparent difference by expanding the scope of immunity as stated in category (4) of the
 
 Cranman
 
 test:
 

 “ ‘Given the divergence between the scope of the immunity granted by § 6-5-338(a) — “conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties” — and summarized in category (4) of the
 
 Cranman
 
 restatement — “exercising judgment in the enforcement of the criminal laws of the State ....” — we conclude that immune category 4 of the
 
 Cranman
 
 restatement should be expanded to restate the law of immunity in this area so as to reflect § 6-5-338(a).
 

 “ ‘Because the peace officers’ immunity statute does not limit the availability of immunity to “enforcement of the criminal laws,” we today modify category (4) of
 
 Cranman
 
 to read as follows:
 

 “ ‘ “A State agent
 
 shall
 
 be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
 

 [[Image here]]
 

 “ ‘ “(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons, or
 
 serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-3S8(a), Ala.Code 1975.”
 
 ’ ”
 

 Kennedy,
 
 992 So.2d at 1282 (final emphasis in
 
 Kennedy
 
 indicates additional language).
 

 Moreover,
 

 “ ‘[tjhis Court has established a “burden-shifting” process when a party raises the defense of State-agent immunity.’
 
 Ex parte Estate of Reynolds,
 
 946 So.2d 450, 452 (Ala.2006). A State agent asserting State-agent immunity ‘bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity.’ 946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in
 
 Cranman
 
 is applicable.”
 

 Kennedy,
 
 992 So.2d at 1282. Those two categories of exceptions are:
 

 “(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 

 “(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.”
 

 Cranman,
 
 792 So.2d at 405.
 

 In the present case, we have no difficulty concluding that the officers carried their burden of demonstrating that, at the times relevant to this matter, they
 
 *844
 
 were engaged in law-enforcement functions for which statutory and State-agent immunity are available, unless one of the two categories of exceptions to immunity recognized in
 
 Cranman
 
 applies. The facts the parties have placed before this Court on this mandamus petition demonstrate: (1) that the officers were attempting, generally, to enforce the criminal laws of the State; and (2) that the actions Officer Bentley took in booking Riley and Lt. Cook took in disseminating information about the arrests resulting from the prostitution sting involved the exercise of discretion within the line and scope of their law-enforcement duties, either, in the case of Officer Bentley, as a member of the processing team responsible for booking the 10 women arrested on September 15, 2006, and preparing the necessary paperwork documenting the arrests, or, in the case of Lt. Cook, as the on-call PIO who was responsible for disseminating information to the media about the prostitution sting operation. Given this showing, to defeat the summary-judgment motion asserting State-agent immunity as to the officers, the McQuirters had the burden of demonstrating that one of the exceptions to immunity applied.
 
 [3]
 
 In other words, the McQuirters had the burden of presenting evidence indicating that an issue of material fact existed as to Officer Bentley’s and/or Lt. Cook’s conduct, such that that conduct fell within one of the two
 
 Cran-man
 
 exceptions.
 

 Based on the materials before us, we conclude that the McQuirters failed to present any evidence or legal authority to the trial court that might support the conclusion that Lt. Cook’s conduct fell within either of the aforementioned exceptions. Thus, as to Lt. Cook, the trial court erred by not entering a summary judgment in his favor.
 

 As to Officer Bentley, the McQuirt-ers have relied on this Court’s holding that one of the ways in which a plaintiff can show that “[a] State agent acts beyond [his or her] authority and is therefore not immune [is by proffering evidence proving that the State agent] ‘fail[ed] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.’ ”
 
 Giambrone v. Douglas,
 
 874 So.2d 1046, 1052 (Ala.2003) (quoting
 
 Ex parte Butts,
 
 775 So.2d at 178). The McQuirters first contend that Officer Bentley failed to follow an MPD policy that required her to obtain Riley’s name, date of birth, and Social Security number and run that information through the NCIC to determine whether Riley had any outstanding warrants. They contend that in light of this policy, Officer Bentley had no discretion in carrying out these duties, i.e., they contend that she acted beyond her authority by not acting in accordance with detailed rules or regulations of the MPD. The McQuirters attempt to demonstrate the existence of such a policy from redacted deposition tes
 
 *845
 
 timony of Lt. Cook they have attached as an exhibit to their brief in this Court.
 
 [4]
 
 The pertinent portion of Lt. Cook’s deposition states:
 
 [5]
 

 “Q: Is there a policy within the police department that upon arresting somebody, an officer is supposed to verify by some means the identity of the person arrested?
 

 “A: Yes.
 

 [“Q:
 
 Is that a written policy ?
 

 “A: Well, you learn in the academy what you’re supposed to do when you make contact with a
 
 person.]
 

 “Q: And what are you supposed to do? “A: You get their — gather their information, run that information through NCIC.
 

 [“Q:
 
 When you say gather the person’s information, what information does that consist of?
 

 “A: You’re going to ask him the name and possibly the date of birth. If at all possible, you might get their Social Security number.
 

 “Q: Any other information?
 

 “A No.]
 

 “Q: And then you said you run that through the NCIC?
 

 “A: Which would be channel
 
 2.
 

 “Q: And what happens next after you run it through NCIC?
 

 “A: After you run it through NCIC, the dispatcher will come back and let you know whether this person has warrants or anything on them or not.
 

 [“Q:
 
 Okay. Under this policy, we’re talking about, are there any other steps an officer is supposed to take to confirm an individual’s identity?
 

 ‘A: Not to my
 
 knowledge.]
 

 [[Image here]]
 

 “Q: And let me go back for just a minute. I sort of got sidetracked on the — when I was asking you about the policy to learn the identity of a person that’s arrested, let me make sure I understood. The only policy that you’re aware of is that an officer needs to ask the name, date of birth, Social Security number of the person they’re arresting; is that right?
 

 “A: Yes.
 

 [[Image here]]
 

 “Q: Well, when you were supervising the patrol division, was that still the policy back then?
 

 “A: Yes.
 

 “Q: Well, if somebody commits a crime across the street there today, can you go arrest them?
 

 “A: Yes.
 

 “Q: And if you go over there and arrest somebody today, how are you going to confirm the identity according to the policy that’s in place today?
 

 “A: Just like I told you right here, that I’m going to get the name, date of
 
 *846
 
 birth, possibly the Social Security number.”
 

 Even if the foregoing testimony were deemed to establish that a policy exists in the MPD generally requiring officers to obtain an arrested person’s name, birth date, and possibly Social Security number, it does not establish the exact processing steps that an officer must follow to obtain this information. It does not indicate what steps an officer must take to verify the accuracy of information received orally from an arrested person or what an officer must do if he or she receives conflicting information from the arrested person. Moreover, the testimony provides no information about the steps an officer must take for obtaining photographs of arrested persons if the MPD does not have a booking photograph on file or whether any steps should be taken to verify that an arrested person appears to be the person in the photograph that is included in the daily activity report. Under these circumstances, we cannot conclude that the MPD “policy” regarding the verification of an arrestee’s identity includes “detailed rules or regulations” that Officer Bentley violated in this case so as to support a conclusion that she acted beyond her authority.
 

 On the facts before the trial court, it appears that Officer Bentley followed the MPD policy, if there is one, because she asked for Riley’s name, her birth date, her Social Security number, and even her address. At least some, perhaps even most, of the information Riley provided in response to Officer Bentley’s questions indicated that she was the person she represented herself to be to Officer Bentley, i.e., Gwendolyn McQuirter. Thus, in Officer Bentley’s judgment, nothing was amiss. Officer Bentley then used her judgment in accessing LETS to obtain Gwendolyn McQuirter’s driver’s license photograph, an action that both Officer Bentley and Lt. Cook indicated was not unusual when the MPD does not have a booking photograph on file. According to her testimony, Officer Bentley did not notice a distinct difference between the image in the photograph and whatever recollection she had of the person she previously had seen, a judgment that for all that appears is one within her discretion.
 
 [6]
 
 On the whole, we cannot conclude that Officer Bentley did not operate within her discretion as she performed her tasks as a processing officer in questioning Riley and assembling the daily activity report.
 

 Based on the foregoing, the McQuirters have not met their burden of proffering evidence of a detailed policy that either of the officers violated in the course of his or her duties that would lift the cloak of State-agent immunity. In other words, the McQuirters failed to demonstrate that either Lt. Cook or Officer Bentley acted beyond his or her authority in the course of processing Riley and disseminating information to the public about the prostitution sting operation. At most, the facts demonstrate that a mistake was committed
 
 *847
 
 in the course of ordinary law-enforcement duties, a mistake that was caused ultimately by Riley’s criminal actions. Accordingly, we conclude that Officer Bentley and Lt. Cook are entitled to State-agent immunity and that the trial court erred by not granting their motion for a summary judgment.
 

 B. Claims Against the City
 

 The McQuirters’ sole argument for liability against the City relied upon the conclusion that Officer Bentley and Lt. Cook are not entitled to State-agent immunity. Because we have concluded that the officers are entitled to State-agent immunity, this argument falls of its own weight. See § 6-5-338(b), Ala.Code 1975 (“extending] immunity ... to peace officers
 
 and
 
 governmental units or agencies authorized to appoint peace officers”).
 

 TV. Conclusion
 

 We conclude that Officer Bentley and Lt. Cook are entitled to State-agent immunity and, therefore, that the trial court erred when it denied their motion for a summary judgment. Because the McQuirters’ sole argument against the City relied on the liability of Officer Bentley and Lt. Cook, the trial court erred when it denied the motion for a summary judgment as to the City. Thus, we issue the writ.
 

 The McQuirters’ motion to strike the unredacted deposition testimony that is attached to the petitioners’ reply brief is denied (see note 4, supra).
 

 MOTION TO STRIKE DENIED; PETITION GRANTED; WRIT ISSUED.
 

 WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
 

 LYONS, J., concurs m the result.
 

 COBB, C.J., recuses herself.
 

 [1]
 

 . Officer Bentley had never seen or had any prior dealings with Riley before her arrest on September 15, 2006.
 

 [2]
 

 . Riley had been friends with McQuirter for several years and may have occasionally lived in the McQuirters' home.
 

 [3]
 

 . The McQuirters cite
 
 Ex parte Wood,
 
 852 So.2d 705 (Ala.2002), for authority that the officers have not shifted the burden by demonstrating that their actions fall under one of the
 
 Cranman
 
 categories entitling them to State-agent immunity.
 
 Wood
 
 is inapposite for at least two reasons. First, this Court rejected the mandamus petition of the director of the Department of Youth Services in
 
 Wood
 
 asserting State-agent immunity specifically because the director had failed to include in his affidavit "any significant facts relating to his personal involvement in the actions giving rise to the claims asserted against him.” 852 So.2d at 710. That is simply not the case here. Detailed facts were provided to the trial court with regard to the actions of both Officer Bentley and Lt. Cook in regard to the McQuirters' claims. Moreover, as this Court explained in
 
 Hollis v. City of Brighton,
 
 950 So.2d 300, 309 (Ala.2006), § 6-5-338(a), Ala. Code 1975, expands the categories of State-agent immunity for police officers in a way not available to education officials.
 

 [4]
 

 . The petitioners include the unredacted deposition testimony in their reply brief. The McQuirters have filed a motion to strike the portion of the petitioners’ reply brief that includes the unredacted deposition testimony on the ground that the testimony was not before the trial court. The pertinent portion of Lt. Cook’s unredacted deposition testimony, however, was, in fact, read in full to the trial court in the hearing on the motion for a summary judgment. Thus, we deny the motion to strike. We also note that the unre-dacted testimony merely provides more context for the answers provided by Lt. Cook; the redacted answers do not establish the existence or exact nature of the alleged policy any more definitively than does the full testimony.
 

 [5]
 

 . The redacted portions of the testimony (the parts omitted by the McQuirters, but read to the trial court) are indicated by the emphasized language in brackets.
 

 [6]
 

 . The McQuirters have offered nothing to the contrary. The record does not disclose how much time elapsed in this case, or generally does elapse, between the time an officer takes information from an arrested person and the time he or she obtains a photograph to attach to the daily activity report. Thus, it is unclear whether an officer can make an immediate comparison between an arrested person and the photograph that is being attached to the daily activity report. In any event, the record before us contains no indication that requiring the processing officer to include in his or her daily activity report the arrested person's photograph is imposed for verification of identity purposes, as opposed to assuring a complete record of the arrest. A fortiori, the McQuirters have not demonstrated the existence of an MPD policy that required Officer Bentley to visually confirm that the person arrested was the person depicted in the photograph attached to the daily activity report.