BOLIN, Justice.
The City of Montgomery (“the City”) and its employees, police officers J.J. Oglesby, J.M. Stewart, A.T. Caffey, Q.O. Commander, and N.W. McMahon petition this Court for a writ of mandamus directing the Montgomery Circuit Court to enter a summary judgment in their favor on certain claims asserted against them by Dashad Berry, Kamessa Williams, and Miguel Johnson (hereinafter collectively referred to as “the plaintiffs”).[1]

Facts

I. Dashad Berry

Dashad Berry is a T-4 paraplegic, paralyzed from the chest down. On March 18, 2009, Jeremy Beamon and Thomas Roberson picked Berry up at his house to go purchase cigarettes. Berry transferred himself from his wheelchair into the backseat of Beamon’s vehicle. Berry’s friends then placed his wheelchair by the front door of Berry’s house. The three left Berry’s house with Beamon driving, Roberson in the front passenger seat, and Berry in the backseat. Approximately one mile from Berry’s residence, the trio encountered a driver’s license checkpoint on Lower Wetumpka Road. When Beamon could not produce a driver’s license, he was directed by a police officer to move his vehicle to a parking area. Officer J.A. Kennedy got Beamon’s contact information and returned to his patrol car to determine if Beamon had a valid driver’s license and any outstanding warrants.
In the meantime, another police officer on the scene smelled marijuana coming from the vehicle and asked Beamon, Roberson, and Berry to get out of the vehicle so that the vehicle could be searched. Beamon and Roberson complied and were seated on the ground next to the vehicle. Berry notified the officer that he was a paraplegic and that he could not get out of the vehicle. Officer J.J. Oglesby, the supervising officer on the scene, was summoned to the vehicle. Berry stated that Officer Oglesby asked him what paraplegic meant and that Berry responded that it meant he had a “complete injury” and that he could not get out of the vehicle without his wheelchair. Berry testified that at the time he had in his possession catheters and lubricating jell. Beamon and Roberson also told the officers that Berry was a paraplegic.
Berry testified that he was told by an officer — whom he could not identify other *286 than as being white — that if he did not get out of the vehicle and sit on the ground he would be “Tased.” Berry testified that he then asked the officer if he could telephone his mother to bring his wheelchair to the scene and that the officer replied that “they did not want any mama drama there.” Berry stated that he then asked Beamon to telephone his mother and that the officers told Beamon that if he picked up his cellular telephone he would be placed in the back of a patrol car.
Berry placed his hands behind his back and was handcuffed. Berry was then removed from the vehicle by Officers Ogles-by and Kennedy and was carried a short distance to a patrol car. One officer was behind Berry holding him under the armpits while the other officer was in front of Berry holding him by the legs as they carried him to the patrol car. Berry was placed on the edge of the backseat of the patrol car and Officer Kennedy positioned himself in front of Berry to support him as Officer Oglesby went around to the other side of the patrol car to reach through the backseat to slide Berry into the patrol car. Berry stated that while he was sitting on the edge of the backseat of the patrol car he slid off the seat and fell to the ground, striking his back on the bottom frame of the patrol car. Officer Kennedy stated that Berry slipped out of the backseat and that he caught him and eased Berry down onto the frame of the patrol car. Berry was then lifted up by the officers and placed in the backseat of the patrol car.
Officer Oglesby testified that he did not initially believe that Berry was a paraplegic because there was no wheelchair in the vehicle, Berry was sitting upright in the backseat without using his hands to steady himself, and another officer indicated that he had seen Berry’s leg moving. Officer Oglesby stated that he did not ask Berry what “paraplegic” meant, that he did not threaten to “Tase” him if he did not get out of the vehicle, and that he did not remember Berry asking to telephone his mother. Officer Oglesby stated that it was eventually determined that Berry was indeed paralyzed and would have to be physically removed from the vehicle in order for the vehicle to be searched. Officer Oglesby stated that the safety of the officers searching the vehicle necessitated that Berry be removed from the vehicle. Officer Oglesby testified that he contacted an emergency-room nurse before removing Berry from the vehicle to determine if there were any special precautions that needed to be taken in moving a paraplegic. Officer Oglesby stated that Berry was handcuffed before being removed from the vehicle to ensure that Berry could not grab the officers or their weapons because Berry would be in close proximity to the officers while the officers’ hands were occupied carrying Berry. Officer Oglesby stated that Berry was upset and cursing the officers as they removed him from the vehicle and that he refused to be placed on the ground with Beamon and Roberson.
Berry stated that the officers did not question him while he was in the patrol car. The search of Beamon’s vehicle revealed the presence of marijuana seeds and stems; however, no one was arrested. Beamon was ticketed for failing to have a driver’s license, and the three men were released. Beamon and Roberson moved Berry from the patrol car to Beamon’s vehicle.
Berry testified that his mother took him to the emergency room the next day after he began experiencing pain in his back. Berry was diagnosed with abrasions on his back and was told that his abrasions would take longer to heal because of his paralysis.

*287
II. Kamessa Williams

Kamessa Williams was 88 years old at the time of the incident giving rise to her claims; she suffered from avascular necrosis, “modeeular” necrosis, arthritis, and had had two hip-replacement surgeries. She testified that she has limited range of motion and cannot move quickly.
On July 30, 2009, a police officer was patrolling in the area of Sheldon Lane when an unknown person shot the window out of the officer’s patrol car. The following evening police officers were directed to work a “saturation detail” in the area of Sheldon Lane. The officers were directed to take a zero-tolerance approach toward any illegal activity, including traffic violations. Officers M.A. Engberg and J.M. Stewart were part of the saturation detail. They arrived in the area of Sheldon Lane at approximately 9:00 p.m. and immediately pulled a car over for a traffic violation. The officers got out of their patrol car and made contact with the driver of the vehicle. At the time the officers were making the traffic stop, a large group of people, including Williams, had gathered at Williams’s mother’s mobile home, which was located in close proximity to two other mobile homes approximately 100 yards from the scene of the traffic stop.[2] While the officers were conducting the traffic stop, gunshots were fired in their direction from the group that had gathered near Williams’s mother’s mobile home. Officer Engberg testified that he actually saw the muzzle flash of the weapon. Officers Eng-berg and Stewart, along with Officer R.L. Douglas, who was also working the saturation detail, took cover behind the patrol car. The three officers drew their weapons and ran toward the group, ordering everyone to get down on the ground. As the officers were running toward the group and ordering everyone to the ground, they saw several people run from behind a sport-utility vehicle (“SUV”) that was parked in the road. Officers Engberg and Douglas ran around the front of the SUV and saw Williams, who was squatting down beside the passenger door, facing the door. Officer Engberg stated that Williams had her hands tucked between her legs. Williams testified that her hands were “open” and that she was telling the officers she was disabled and could not get on the ground. In the meantime, Officer Stewart had ran around the back of the SUV and saw Williams squatting beside the passenger door of the SUV with her back to him. Officer Stewart stated that he could not see Williams’s hands and that, because he thought she might have had a weapon, he placed his foot on her back and pushed her to the ground. Williams stated that Officer Stewart “kicked” her in the back and then “stomped” her in the back.
The officers placed approximately four to eight people, including Williams, on the ground in order to search them for weapons and to run warrant checks on them. The scene was chaotic, and several members of the group were hysterical. Williams’s daughter, who witnessed the incident, became irate and was yelling at the officers that Williams was disabled. Williams testified that Officer Stewart replied “I don’t give a f — Williams further testified that a family friend who was present told Officer Stewart that Williams was disabled and asked why he kicked her and that Officer Stewart replied “I don’t give a f— about her being disabled.” Officer Stewart denied using profanity to refer to Williams or to her being disabled. Officer Engberg testified that while Williams *288 was on the ground she told him that she was disabled, that she was injured, and that she was being bitten by fire ants. Officer Engberg stated that once Williams was searched and it was determined that she was not in possession of a weapon she was helped from the ground and was seated in a lawn chair. Officer Engberg testified that Williams was on the ground for no longer than two minutes. Officer Eng-berg further stated that he immediately radioed for an ambulance and medical assistance for Williams and that Williams’s mother was allowed to sit with her until the paramedics arrived.
Williams testified that Officer Stewart required her to lie on the ground for approximately 30 minutes while she was being bitten by ants. She stated that she was still lying on the ground when the paramedics arrived. Officer Douglas testified that Williams was required to lie on the ground with the other individuals until they were searched and the warrant checks completed. Officer Douglas stated that Williams complained about being injured and being bitten by ants and that she could have been lying on the ground for up to 30 minutes.
Officer M.D. Chandler, a major in the police department’s communications department, reviewed a record of the radio traffic the night in question, which indicated that Officers Engberg and Stewart radioed at 2156 hours that shots were fired and requested medical assistance for a citizen at 2202 hours. An emergency-medical-run report completed by the paramedics indicates that they arrived on the scene at 2212 hours — 10 minutes after the officers requested medical assistance.
No weapon was found at the scene, and no one present was charged or arrested. Paramedics transported Williams to the emergency room. Williams’s medical records indicate that she was diagnosed with scrapes, abrasions, back strain, contusions, and chest-wall pain. She was prescribed pain medication and was discharged. Williams testified that she also suffered numerous ant bites and that, since the incident, she has had difficulty performing her usual daily tasks.

III. Miguel Johnson

At the time of the incident giving rise to these claims, Miguel Johnson was 38 years old and weighed approximately 360 pounds. Johnson had had previous surgeries on his knee and hip in which screws had been placed in both, and he suffered from a shoulder injury for which he had received treatment. Johnson stated that he also suffered from spinal stenosis, which caused him to suffer back pain.
On September 10, 2009, Johnson and his friend, Jamal Rouse, were driving on Chapman Street during a light rain. Johnson proceeded to make a right turn onto Heustess Street when the tie rod in the wheel assembly of the vehicle broke, causing the vehicle to careen into the concrete curb, damaging both the curb and the vehicle. Johnson testified that the tire of the vehicle was flat and the wheel twisted toward the curb and that he knew that he could not drive the vehicle and that he was going to need a wrecker service. Johnson stated that he intended to jack up the vehicle, change the flat tire, and then twist the wheel back in line so that the vehicle could more easily be rolled onto and off the wrecker. Johnson got the jack and the spare tire from the vehicle and sat on the curb to change the tire.
Officer Q.O. Commander was dispatched to the scene. Officer Commander asked to see Johnson’s driver’s license and proof of insurance. Johnson testified that he handed Officer Commander his wallet, which contained his driver’s license and eight $100 bills, which were part of an insurance settlement that he had received. Johnson *289 stated that Officer Commander walked to his patrol car and was gone for a couple of minutes. When Officer Commander returned he requested proof of insurance from Johnson. Johnson, who was busy changing the tire, stated that he consented to Officer Commander’s searching his glove compartment for the proof of insurance. Officer Commander was unable to locate proof of insurance, so he returned to his patrol car to write Johnson a ticket for not having proof of insurance and to call a wrecker service.
The weather was inclement in Montgomery on the day of the incident and there were several traffic accidents. Officer Commander was working as an accident investigator at the time and was needed at other accident scenes. He requested a second patrol unit to come to the scene of Johnson’s accident to wait for the wrecker. Officer Commander testified that while he was waiting on the second patrol unit and the wrecker to arrive, two females walked to the scene and waited with Johnson and Rouse. Subsequently, the wrecker and a second patrol unit occupied by Officers D.D. Jones and G.R. Killough arrived at the scene. Johnson testified that Officer Commander handed him the ticket for failure to have proof of insurance and turned to walk back to his patrol car. Johnson stated that at that time he realized that he did not have his wallet and called out to Officer Commander, “[EJxcuse me, sir, you did not give me back my wallet.” Johnson testified that Officer Commander ignored him and walked to his patrol car and drove off. Johnson admitted that he then went “haywire” and that he began “cussing” and “going off’ because the wallet contained the cash from the insurance settlement he had received.
Officers Jones and Killough testified that Johnson was visibly upset and was accusing a police officer of having taken his money. Officer Jones located Johnson’s wallet on the ground and handed it to Johnson. Johnson stated that when he looked in the wallet he discovered that seven of the eight $100 bills were missing. Johnson testified that he was “heated.” The officers advised Johnson on how to file a complaint with the police department. Officers Jones and Killough left the scene once the wrecker was ready to tow Johnson’s vehicle, and they had no further contact with Johnson. Officer Commander testified that he did not take any money from Johnson’s wallet and that the wallet was in Johnson’s possession when he left the scene.
In the meantime, Johnson and Rouse had accepted a ride to Johnson’s house from a friend of Johnson’s who had happened by the accident scene. Johnson testified that he telephoned emergency 911 while en route to his house to report that a police officer had stolen his money. Johnson stated that he was told that a patrol unit would be sent to his house. Once Johnson and the wrecker reached Johnson’s house, the wrecker driver had his boss call emergency 911 because Johnson was accusing the driver of the wrecker of having taken his money.[3]
Officer N.W. McMahon was the first police officer to arrive at Johnson’s residence. Johnson admitted that after Officer McMahon had gotten out of his patrol car Johnson approached the officer “upset” and “angry,” telling Officer McMahon that another officer had stolen his money and that “you can’t trust the police department.” Johnson stated that Officer McMahon told him to step back and shut *290 up. Officer McMahon called for backup. Johnson testified that two or three patrol units and “a lot of’ officers soon arrived on the scene. Johnson testified that he approached the officers who had just arrived on the scene while he was upset, trying to explain to them what had happened when Officer McMahon yelled “shoot his ass; [TJase his ass; he [said he would] kill an officer.” Johnson stated that the officers drew their weapons and that his wife, who was present, jumped in front of him stating, “[H]e did not say that.” Johnson testified that he then turned around and placed his hands on his vehicle. Johnson testified that the officers “roughed” him up by bending his arm behind his back and “hooking” him around his neck. Johnson stated that he tried to explain to the officers that he had called them to report a theft and that he was disabled with “screws in [his] body.” He stated that, as the officers were placing him in handcuffs, he told them they would need two pair of handcuffs to handcuff him because he had a bad shoulder. Johnson testified that an officer whom he could not identify responded, “[Y]ou won’t get two sets today motherf — .” Johnson stated that the officer then kneed him in the back and placed a single pair of handcuffs on him. Johnson stated that he screamed because of the pain in his shoulder. Johnson was unable to identify the officer who placed him in handcuffs but specifically stated that it was not Officer McMahon who, he said, was occupied with Johnson’s wife at the time.
Johnson was led to a patrol car by an officer and was told to get in the backseat. Johnson testified that the front seat of the patrol car was “back far” and that he could not get in the backseat because of his size and limited mobility. He stated that he asked the officer to move the front seat forward. Johnson testified that Officer A.T. Caffey then “football block[ed]” him into the backseat of the patrol car, stating, “[G]et your ass on in there; ain’t nobody fixing to put up with your shit; nobody got time for this.” Johnson stated that, when he asked the officers why he was being treated in such a manner and explained that he had called them, they responded, he said, by telling him to shut up.
Officer McMahon testified that Johnson was very upset when he arrived on the scene and that Johnson threatened to kill police officers. Officer McMahon stated that he felt threatened by Johnson and requested a patrol unit equipped with a Taser. Officer McMahon admitted that he threatened to have Johnson “Tased” but denied that he used obscene language in doing so. However, Officer McMahon stated that he would have been within the police department’s force-continuum standard had he done so. Officer McMahon testified that Johnson became compliant once the officers pointed the Taser at him. Officer McMahon further testified that Johnson did inform the officers that he could not bend down to get into the patrol car because of screws in his knee and hip.
Officer Caffey testified that he and Officer M.L. Manor responded to a request for assistance from Officer McMahon. Officer Caffey stated that when he and Officer Manor arrived at the scene Johnson was “yelling” and “cursing” at Officer McMahon and that Officer McMahon told Johnson to calm down or he would be arrested. Officer Caffey stated that Johnson was eventually arrested and placed in the patrol car. Officer Caffey testified that two pairs of handcuffs were placed on Johnson because of his size. Officer Caffey further stated that Johnson stated that another police officer had taken his money and he advised Johnson that he needed to contact a supervisor in the police department or the police department’s internal-affairs division.
*291 Officer Manor testified that Officer McMahon radioed that he had a subject who was being belligerent and requested a unit with a Taser. Officer Manor stated that when he and Officer Caffey arrived at the scene Johnson was screaming and a crowd was gathering. Officer Manor stated that the officers “had a time” trying to get Johnson to become calm but that he eventually became compliant. Officer Manor testified that he placed two sets of handcuffs on Johnson because of his size and placed him in the patrol car. Officer Manor further testified that Johnson complained of certain disabilities when they placed him in the patrol car and that they accommodated Johnson as best they could but that it is difficult to transport a man of Johnson’s size comfortably. Officer Manor denied kneeing Johnson in the back when he handcuffed him and also denied that anyone shoved Johnson into the patrol car.
Johnson was arrested and charged with disorderly conduct. He was transported to the city jail by Officers Manor and Caffey. Johnson testified that while en route to the jail he told the officers that he was in pain. Johnson stated that when they arrived at the jail his legs were swollen and his pants were down below his knees. He testified that he asked the officers to pull his pants up and an officer replied, “[Y]ou know how you young folks like fall’s pants to sag.” Johnson stated that he responded that he was almost 40 years old and did not let his pants sag. Johnson testified that he continued to try and explain that an officer had taken his money. He stated that while he was in the “booking room” he grabbed a pair of scissors and tried to cut his wrist in desperation. Johnson testified that he was treated by the jail nurse and that he suffered back, leg, neck, and shoulder pain. After Johnson was released from jail, he sought treatment from his physician for his pain. Johnson testified that he continues to experience pain and emotional stress from the incident.

Procedural History

In January 2010, the plaintiffs sued the City and Officers Oglesby, Stewart, Caf-fey, and McMahon alleging assault and battery, wantonness, negligence, negligent hiring, negligent training, and negligent supervision. On March 8, 2011, Johnson amended his complaint to assert a claim of theft against Officer Commander. On April 1, 2011, Johnson amended the complaint once again to assert a claim of negligence against Officer Commander alleging that Officer Commander failed to carefully safeguard the money in Johnson’s wallet while the wallet was in Officer Commander’s possession.
On June 28, 2011, the City and the officers moved the trial court for a summary judgment, arguing that they were immune from the plaintiffs’ claims pursuant to § 6-5-338(a), Ala.Code 1975, and the doctrine of State-agent immunity set forth in Ex parte Cranman, 792 So.2d 392 (Ala.2000), and adopted by this Court in Ex parte Butts, 775 So.2d 173 (Ala.2000). On July 25, 2011, the plaintiffs filed their response in opposition to the motion for a summary judgment. On August 10, 2011, the trial court entered an order denying the City and the officers’ motion for a summary judgment. This petition followed.

Standard of Review

This Court has stated:
“ ‘While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996)....
*292 “‘Summary judgment is appropriate only when “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala.1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala.1996), Fuqua v. Ingersollr-Rand Co., 591 So.2d 486 (Ala.1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala.1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
“ ‘An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fu-qua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala.1991), Boland v. Fort Rucker Nat’l Bank, 599 So.2d 595 (Ala.1992), Rowe v. Isbell, 599 So.2d 35 (Ala.1992).” ’
Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala.2000)). A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: “ ‘(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.’ ” Ex parte Nall, 879 So.2d 541, 543 (Ala.2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270,1272 (Ala.2001)).

Discussion

Section 6-5-338(a) provides:
“Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.”
The restatement of State-agent immunity as set out by this Court in Ex parte Cran-man, supra, governs the determination of whether a peace officer is entitled to immunity under § 6-5~338(a). Ex parte City of Tuskegee, 932 So.2d 895, 904 (Ala.2005). This Court, in Cranman, stated the test for State-agent immunity as follows:
“A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis *293 of the claim against the agent is based upon the agent’s
“(1) formulating plans, policies, or designs; or
“(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“(a) making administrative adjudications;
“(b) allocating resources;
“(c) negotiating contracts;
“(d) hiring, firing, transferring, assigning, or supervising personnel; or “(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or “(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
“Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
“(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith,
beyond his or her authority, or under a mistaken interpretation of the law.”
Cranman, 792 So.2d at 405. Because the scope of immunity for law-enforcement officers set forth § 6-5-338(a) was broader than category (4) of the restatement adopted in Cranman, this Court, in Hollis v. City of Brighton, 950 So.2d 300, 309 (Ala.2006), expanded and modified category (4) of the Cranman test to read as follows:
“ ‘A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
“ ‘(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala.Code 1975.’ ”
Hollis, 950 So.2d at 309. Additionally:
“ ‘This Court has established a “burden-shifting” process when a party raises the defense of State-agent immunity.’ Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006). A State agent asserting State-agent immunity ‘bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity.’ 946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in Cranman is applicable. The exception being argued here is that ‘the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.’ 946 So.2d at 452. One of the ways in which a plaintiff can show *294 that a State agent acted beyond his or her authority is by proffering evidence that the State agent failed ‘ “to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.” ’ Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003) (quoting Ex parte Butts, 775 So.2d at 178).”
Ex parte Kennedy, 992 So.2d 1276, 1282-83 (Ala.2008).
The plaintiffs contend that the defendant police officers are not entitled to State-agent immunity because, they argue, the officers acted beyond their authority or under a mistaken interpretation of the law in violation of the “Law Enforcement and Disabilities Manual.” The City and the defendant officers state that that manual is a document used by the Alabama Disability Crime Prevention Task Force in continuing-education courses for law-enforcement officers throughout the state and that it is not a detailed set of rules or regulations adopted by the City.
The plaintiffs have failed to present any evidence indicating that the Montgomery Police Department has adopted the provisions of the Law Enforcement and Disabilities Manual or that the manual is binding upon the defendant officers. Although the defendant officers did testify that they received training in the police academy on how to deal with citizens with disabilities with whom they might come into contact, such instruction or training could hardly be described as “detailed rules or regulations, such as those stated on a checklist,” that imposed duties to be discharged by the defendant officers. Ex parte Kennedy, 992 So.2d at 1282-83. The manual, itself, can best be described as a teaching tool for law-enforcement officers in dealing with disabled persons. It expressly states: “This manual is not intended to provide legal advice. Consult your department attorney for all final decisions.” Accordingly, we conclude that the plaintiffs failed to establish that the defendant officers acted beyond their authority by failing “‘“to discharge duties pursuant to detailed rules and regulations.”’” Ex parte Kennedy, 992 So.2d at 1282-83 (quoting Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003), quoting in turn Ex parte Butts, 775 So.2d at 178).

I. Claims Against the Defendant Officers

A. Claims Asserted by Dashad Berry

Berry alleged in his complaint that Officer Oglesby pulled him from Beamon’s vehicle and caused him to slide off the backseat of the patrol car, resulting in injuries. Berry alleged that in doing so Officer Oglesby acted intentionally or with deliberate indifference, in bad faith, or under a mistaken interpretation of the law.
After reviewing the materials in support of this petition for a writ of mandamus, we conclude that Officer Oglesby satisfied his burden of demonstrating that at the time of the incident giving rise to Berry’s claims Officer Oglesby was engaged in law-enforcement functions for which State-agent immunity would be available under § 6-5-338(a) and under Cranman, as modified by Hollis. The evidence demonstrates: (1) that Officer Oglesby was present at a driver’s license checkpoint and was working within the line and scope of his duties as a police officer when the vehicle in which Berry was a passenger was stopped; (2) that the driver of the vehicle could not produce a valid driver’s license; (3) that the smell of marijuana was detected in the vehicle; (4) and that Officer Oglesby, for the purpose of officer safety, directed that Berry be handcuffed and removed from the vehicle so that the vehicle could be properly searched. These are circumstances that would entitle Officer Oglesby to State-agent immunity barring a showing *295 by Berry of one of the two categories of exceptions to immunity enunciated in Cranman.
Berry argued in the trial court, as he does in response to this petition, that Officer Oglesby acted willfully, maliciously, and in bad faith in removing him from the vehicle and allowing him to fall from the backseat of the patrol car. He points to the following as evidence of Officer Ogles-by’s alleged willfulness, maliciousness, and bad faith: (1) that, despite being informed by Berry and his friends that Berry was a paraplegic, Officer Oglesby and a subordinate officer threatened to “Tase” Berry if he did not get out of the vehicle; (2) that Officer Oglesby questioned Berry as to what paraplegia was and that Berry was denied the reasonable accommodation of having his mother bring his wheelchair to the scene; (3) and that Berry was “yanked” from Beamon’s vehicle and “thrust” into the patrol car, where he was allowed to fall from the backseat.
We first note that Officer Oglesby admitted that he did not initially believe that Berry was a paraplegic because there was no wheelchair in the vehicle, because Berry was sitting upright in the backseat without the use of his hands, and because another officer indicated that he had seen Berry’s leg moving. Officer Oglesby denied that he threatened to “Tase” Berry, and Berry himself admitted that he could not identify the officer who he alleges threatened to “Tase” him. Second, although the officers at the scene denied Berry’s request to have his mother bring his wheelchair to the scene, the Law Enforcement and Disabilities Manual — the manual the plaintiffs contend the officers were obligated to follow — expressly provides that a person who uses a wheelchair may be handcuffed and transferred to a police car. Finally, although the plaintiffs’ brief describes Berry as being “yanked” from Beamon’s vehicle and “thrust” into the patrol car, nothing in Berry’s testimony describing the incident refers to being “yanked” from Beamon’s vehicle and “thrust” into the patrol car. Berry simply stated that he was handcuffed and that he let Officers Oglesby and Kennedy remove him from the vehicle and carry him a short distance to a patrol car. Assuming, as we must, that the officers allowed Berry to slide off the backseat of the patrol car to the ground, striking his back on the car, the officers were merely negligent in doing so; Berry has presented no evidence indicating that the officers willfully or maliciously allowed him to fall and be injured.
After reviewing the materials submitted in this case, we conclude that Berry has failed to satisfy his burden of establishing that Officer Oglesby acted “willfully, maliciously, fraudulently, in bad faith, or beyond his ... authority” in handcuffing Berry and removing him from Beamon’s vehicle and placing him in the patrol car so as to deny Officer Oglesby immunity from suit. Ex parte Kennedy, 992 So.2d at 1282-83. Accordingly, Officer Oglesby was entitled to a summary judgment as to the claims against him.

B. Claims Asserted by Kamessa Williams

Williams alleged in her complaint that Officer Stewart kicked her to the ground with his foot and forced her to remain on the ground while she was being bitten by ants. Williams alleged that in doing so Officer Stewart acted intentionally or with deliberate indifference, in bad faith, or under a mistaken interpretation of the law.
It is clear from the materials presented in support of the petition for a writ of mandamus that Officer Stewart satisfied his burden of demonstrating that at the time of the incident giving rise to Williams’s claims he was engaged in law- *296 enforcement functions for which State-agent immunity would be available under § 6-5-338(a) and under Cranman, as modified by Hollis. The evidence demonstrates: (1) that Officer Stewart was working a “saturation detail” in an area where gunshots had been fired at a police officer the previous evening; (2) that during a traffic stop gunshots were fired in Officer Stewart’s direction; (3) that Officer Stewart and other officers drew their weapons and ran in the direction from which the gunshots were fired; (4) that Officer Stewart and the other officers ordered a number of individuals to get to the ground; (5) that Officer Stewart encountered Williams crouching behind a vehicle with her back facing him; (6) that Officer Stewart forced Williams to the ground with his foot; and (7) that Officer Stewart and the other officers ran warrant checks on the individuals and searched the individuals while they remained on the ground. Barring a showing by Williams that Officer Stewart acted “willfully, maliciously, fraudulently, in bad faith, beyond his ... authority, or under a mistaken interpretation of the law,” Cran-man, 792 So.2d at 405, these circumstances would entitle officer Stewart to State-agent immunity.
Williams presented evidence that, when viewed, as it must be, in a light most favorable to Williams, Ex parte Turner, supra, indicates that after Officer Stewart forced Williams to the ground he was advised by Williams and others present that she was disabled; that Officer Stewart replied, “I don’t give a f— about her being disabled”; and that Officer Stewart forced Williams to remain on the ground for approximately 30 minutes[4] after he determined that Williams was not armed and had been advised that she was disabled and was being bitten by ants. Accordingly, we conclude that Williams has satisfied her burden under Cranman by presenting evidence that could be viewed as showing that Officer Stewart acted “willfully, maliciously, fraudulently, in bad faith, beyond his ... authority, or under a mistaken interpretation of the law” during the above-described encounter with Williams. Accordingly, Officer Stewart was not entitled to a summary judgment as to Williams’s claims asserted against him.

C. Claims Asserted by Miguel Johnson

1. Officer Commander

Johnson asserted a claim of theft against Officer Commander, alleging that he took $700 from Johnson’s wallet. Johnson also alleged that Officer Commander negligently failed to safeguard Johnson’s money while his wallet was in Officer Commander’s possession.
Officer Commander argued in his motion for a summary judgment that Johnson’s theft claim was based entirely on conjecture and conclusory allegations. The trial court disagreed and denied Officer Commander’s motion for a summary judgment on the theft claim. It does not appear that Officer Commander argued in his motion for a summary judgment that he was entitled to State-agent immunity as to the theft claim. Officer Commander does not argue in the petition for a writ of *297 mandamus that he is entitled to State-agent immunity as to the theft claim. As stated above, the denial of a motion for a summary judgment is not reviewable; however, the denial of a motion for a summary judgment grounded on a claim of immunity is reviewable by a petition for a writ of mandamus. Ex parte Kennedy, supra. Accordingly, the issue whether the trial court properly denied Officer Commander’s motion for a summary judgment as to the theft claim is not before this Court in this petition; the theft claim against Officer Commander apparently is still pending in the trial court.
As for the negligence claim, Johnson alleged in his complaint that Officer Commander “had a duty to Plaintiff Johnson to carefully safeguard the cash in Plaintiffs Johnson’s wallet, but Defendant Commander negligently failed to do so, arid negligently threw Plaintiffs wallet to the ground.” The City and Officer Commander have offered no argument in support of their contention that Officer Commander was entitled to State-agent immunity as to the negligence claim asserted against him. See Rule 28, Ala. R.App. P. The City and Officer Commander have neither cited facts nor made any contentions relevant to this issue, other than to simply say in their petition for a writ of mandamus that the “summary judgment was due to be granted on Counts I, II, III and VIII [the negligence claim against Officer Commander].” Suffice it to say that the City and Officer Commander have failed to demonstrate a clear legal right to the relief sought, and the petition is denied as to the negligence claim against Officer Commander. Ex parte Nall, supra.

2. Officers McMahon and Caffey

Johnson alleged in his complaint that Officers McMahon and Caffey injured him when they arrested, handcuffed, and forced him into the backseat of a patrol car. Johnson further alleged that in doing so Officers McMahon and Caffey acted intentionally or with deliberate indifference, in bad faith, or under a mistaken interpretation of the law.
Again, it is clear from the materials submitted to this Court that both Officer McMahon and Officer Caffey satisfied their burden of demonstrating that at the time of the incident giving rise to Johnson’s claims against them they were engaged in law-enforcement functions for which State-agent immunity would be available under § 6-5-338(a) and under Cranman, as modified by Hollis. The evidence demonstrates: (1) that Officers McMahon and Caffey responded to Johnson’s residence, where they found him “upset” and “angry”; (2) that they ordered him to calm down; (8) that he became compliant only after a Taser was pointed at him; and (4) that he was arrested and charged with disorderly conduct. These circumstances entitle Officers McMahon and Caffey to State-agent immunity, barring a showing by Johnson that the officers acted “willfully, maliciously, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of the law.” Cranman, 792 So.2d at 405.
The evidence, viewed in a light most favorable to Johnson, indicates that Johnson was very upset when Officer McMahon arrived on the scene. Johnson himself testified that soon after Officer McMahon had gotten out of his patrol car Johnson approached the officer “upset” and “angry.” Officer McMahon stated that he felt threatened by Johnson, who is an extremely large individual, and requested assistance from a patrol unit equipped with a Taser. Officer McMahon admitted that he threatened to have Johnson *298 “Tased” if he did not calm down. Johnson became compliant after being threatened with the Taser, and at no point was the Taser actually used. Officer McMahon did not participate in handcuffing Johnson or placing him in the patrol car. Considering the circumstances Officer McMahon encountered upon arriving at Johnson’s residence, we cannot say that Johnson met his burden of showing that Officer McMahon acted “willfully, maliciously, fraudulently, in bad faith, beyond his ... authority, or under a mistaken interpretation of the law” so as to remove Officer McMahon from the cloak of State-agent immunity. Cranman, 792 So.2d at 405. Accordingly, Officer McMahon was entitled to a summary judgment as to Johnson’s claims against him.
As for Officer Caffey, the evidence, when viewed in a light most favorable to Johnson, indicates that, after Johnson became compliant, was handcuffed,[5] and informed the officers of his disabilities, he was led to a patrol car. Because of his size and limited mobility, Johnson asked the officers to move the front seat of the patrol car forward so that he could more easily be placed in the backseat. At that time, Johnson asserts, Officer Caffey “football block[ed]” Johnson into the backseat of the patrol car, stating, “[G]et your ass on in there; ain’t nobody fixing to put up with your shit; nobody got time for this.” Accordingly, we conclude that Johnson has satisfied his burden under Cranman by presenting evidence that could be viewed as showing that Officer Caffey acted “willfully, maliciously, fraudulently, in bad faith, beyond his ... authority, or under a mistaken interpretation of the law” while placing Johnson in the patrol car. Accordingly, Officer Caffey was not entitled to a summary judgment as to the claims asserted against him by Johnson.

II. Claims Against the City

A. Assault and Battery, Wantonness, and Negligence

To the extent that the plaintiffs seek to hold the City vicariously liable for the acts of the officers through then-claims alleging assault and battery, wantonness,[6] and negligence, we note:
“ ‘It is well established that, if a municipal peace officer is immune pursuant to § 6-5-S38(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune. Section 6-5-338(b) provides: “This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers.” See Ex parte City of Gadsden, 781 So.2d 936, 940 (Ala.2000). On the other hand, if the statute does not shield the officer, it does not shield the city. Borders v. City of Huntsville, 875 So.2d 1168, 1183 (Ala.2003).’ ”
City of Crossville v. Haynes, 925 So.2d 944, 955 (Ala.2005) (quoting Howard v. City of Atmore, 887 So.2d 201, 211 (Ala. 2003)).
Because we have concluded that Officers Oglesby and McMahon were entitled to a summary judgment as to the claims asserted against them, the City was also entitled *299 to a summary judgment as to the claims vicariously asserted against it based on the liability of those officers. However, because we have also concluded that Officers Stewart, Commander, and Caffey are not entitled to a summary judgment as to the claims asserted against them, the City is likewise not entitled to a summary judgment as to the claims vicariously asserted against it based on the liability of those officers.

B. Negligent Hiring, Negligent Training, and Negligent Supervision

The plaintiffs have asserted negligent hiring,[7] training, and supervision claims against the City. The City relies upon Haynes, supra, and argues that it is immune from suit as to these claims. We note that the City has failed to identify the individual or individuals specifically charged with the hiring, training, and supervision of the police officers, much less whether the individual or individuals are police officers entitled to State-agent immunity. Therefore, the City has failed to carry its burden under Cranman and was not entitled to a summary judgment as to the negligent hiring, training, or supervision claims asserted against it.

Conclusion

Officers Oglesby and McMahon have shown a clear legal right to the relief sought, and, as to them, the petition is granted and the trial court is directed to enter a summary judgment in their favor. Officers Stewart, Commander, and Caffey have failed to demonstrate a clear legal right to the relief sought, and, as to them, the petition is denied. To the extent that the City has been sued vicariously for the acts of the defendant officers, it has shown a clear legal right to the relief sought as to the claims asserted against it based on the acts of Officers Oglesby and McMahon, and the petition is granted as to those claims, and, as to those claims, the trial court is directed to enter a summary judgment for the City. However, the City has failed to demonstrate a clear legal right to the relief sought as to the claims against it based on the acts of Officers Stewart, Commander, and Caffey, and the petition is denied as to those claims. Finally, the City has failed to demonstrate a clear legal right to the relief sought based on the claims alleging negligent hiring, training, and supervision, and the petition is denied as to those claims.
PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
MALONE, C.J., and WOODALL, STUART, MURDOCK, SHAW, and MAIN, JJ., concur.
WISE, J., recuses herself.

. The claims arise from three separate incidents involving the individual plaintiffs, which incidents are not related to each other. Each plaintiff filed a separate complaint against the City and the particular officers involved in his or her incident. Apparently, the cases were consolidated in the trial court.

. Williams lived in one of the mobile homes located in close proximity to her mother's mobile home.

. Although Johnson stated that he did not have any discussion with the driver of the truck, the record contains a transcript of the 911 call in which the driver’s boss requested assistance at Johnson’s address after Johnson had accused the driver of taking his money.

. Although Williams’s contention that she was on the ground for 30 minutes is disputed by compelling evidence offered by the City and Officer Stewart in the form of the affidavit of Officer M.D. Chandler, who had reviewed a transcript of radio traffic the night in question, and a medical-run report that indicated that only 16 minutes had elapsed from the time Officers Engberg and Stewart radioed that shots had been fired until the paramedics arrived on the scene, we are required to view the evidence in a light most favorable to Williams. Ex parte Turner, supra.

. We note that Johnson alleged that the officers did not use two sets of handcuffs to handcuff him and that he was kneed in the back by the officer who placed the handcuffs on him. Johnson could not identify the officer who placed him in handcuffs. Officer Manor testified that he was the officer who handcuffed Johnson and that he used two pair of handcuffs on Johnson. However, Officer Manor was dismissed from the action by Johnson.

. The plaintiffs conceded in their brief in opposition to the motion for a summary judgment that, as to the City, the wantonness claim should be dismissed.

. The plaintiffs stated in their brief in opposition to the motion for a summary judgment that they "decided to drop their case for negligent hiring, and add instead ‘negligent retention' to [their] negligent supervision and negligent training [claims]." However, because of our resolution of this issue, we need not determine whether they effectively changed the claim.